# SHAREHOLDERS' AGREEMENT

THIS AGREEMENT effective as of the 1st day of January, 2014 by and among THE GATEWAY DEVELOPMENT GROUP, INC. (the "Corporation"), a Connecticut corporation with an office at 2 Dearfield Drive, Suite #3, Greenwich, Connecticut 06831, JOHN J. FARERI ("Fareri"), having an address at 2 Dearfield Drive, Suite #3, Greenwich, Connecticut 06831, and JAMES CARNICELI, JR. ("Carnicelli"), having an address at 2 Dearfield Drive, Suite #3, Greenwich, Connecticut 06831. (Fareri and Carnicelli are sometimes referred to hereinafter as the "Shareholders").

WHEREAS, Fareri is the owner of one hundred two (102) issued and outstanding shares of the Corporation's common stock (the "Shares"); and

WHEREAS, Carnicelli has been and continues to be a valued employee of the Corporation and Fareri wishes to recognize that fact and cause the Corporation to issue ninety-eight (98) Shares to Carnicelli; and

WHEREAS, the operation of the Corporation in accordance with this Agreement will be in the best interest of the Corporation and its Shareholders and creditors.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties agree as follows:

1. Application to Shares.

This Agreement shall apply to all Shares owned by any Shareholder at any time, regardless of how, when (heretofore or hereafter), or from whom acquired. The term "Shareholder" or "Shareholders" shall include any legal representatives of any Shareholders and any person acquiring Shares during the term of this Agreement who becomes a party to this Agreement or is otherwise bound by its terms.

2. Ownership of Shares/Issuance of Shares by the Corporation.

Ninety-eight (98) Shares of the Corporation shall be issued to Carnicelli. One hundred two (102) shares of the Corporation shall continue to be owned by Fareri. The Corporation agrees that it will not issue, or otherwise transfer, any shares of capital stock of the Corporation whether voluntarily or by operation of law, without the prior written consent of each of the Shareholders.

3. Election for Tax Purposes.

The Corporation has elected to be taxed as a "small business corporation" under Subchapter S of the Internal Revenue Code of 1986, as amended (the "Code"). Each Shareholder agrees to execute the necessary shareholder's consents to continue such election and authorizes the filing of such consents with the appropriate district director. None of the Shareholders,

without the prior written consent of each and every other Shareholder, shall take any action, or make any transfer or other Disposition, as hereinafter defined, of his Shares which will result in the termination or revocation of such election.

Without limiting the generality of the preceding sentence, the parties hereto agree that none of the Shareholders, without the prior written consent of each and every other Shareholder, shall effect a Disposition of any of his Shares to: (a) a corporation; (b) an individual who is a nonresident of the United States; or (c) a trust other than a trust described in Section 1361(c) (2) of the Code.

4. Officers.

4.1 The following named persons shall be elected to the office following their names, and shall remain as such during the entire term of this Agreement, except as otherwise in this agreement provided:

>   John J. Fareri .           Chairman of the Board of Directors
>   James Carnicelli, Jr       President
>   Julie Fareri               Secretary

Except as otherwise in this Agreement provided, or required by law, no officer shall be removed, with or without cause, for any reason whatsoever, during the term of this Agreement.

5. Employees; Non-Competition

5.1 The following named persons will be employed in the capacities designated after their names, at the annual salaries respectively set forth, with the duties hereinafter provided for each position, and each expressly accepts said employment:

> a. Employee: James Carnicelli, Jr.
> b. Title: President
> c. Annual Salary: $250,000.00
> d. Duties:
>    i. Work closely with clients, owners, architects and subcontractors to develop lasting relationships over time;
>    ii. Recruit qualified talent; mentor, coach and train them to perform and ensure effective matching of talent to project scope;
>    iii. Be engaged in, and often times, lead client and project pursuit efforts;
>    iv. Provide oversight in managing all necessary resources throughout the entire project from start-up through closeout and ensure that the owner's expectations, budgetary and profitability objectives are exceeded.
>    v. Participate extensively in the business development process by acquiring and defining projects
>    vi. Prepares budgets that will achieve profitability objectives while taking into account project-specific challenges.

vii. Provide leadership and business judgment on all financial and profitability aspects of projects within position scope
viii. Set appropriate milestones and assign staff qualified to handle the scope and complexity of the project.
ix. Ensure that the day-to-day operations of projects are transitioned effectively to Project Managers and Superintendents from Pre-construction when work commences in the field.
x. Participate in, and at times, lead the estimating/budgeting process for competitive proposals.
xi. Assign appropriate Project Management Staff, and coordinate to assemble proper field staff to develop the most qualified project teams.
xii. Responsible for ensuring projects achieve budget and profitability objectives.
xiii. Monitor and evaluate Project Manager and Superintendent staff assignments.
xiv. Accurately forecast project financial performance.
xv. Visit sites regularly to monitor project performance, schedule, and expenditures with project staff, highlight potential challenges and provide leadership in responding creatively to bring projects in on schedule and under budget, where feasible.
xvi. Attend owner and project meetings, maintain continuous client contact to gauge performance perceptions and communicate relevant information to project team.
xvii. Ensure Project Management staff is trained according to company procedures and values, guidelines and expectations.

5.2 There shall be no change in any of the aforesaid salaries, nor in any of the duties of said employees, during the term of said employment.

5.3 Each of the aforesaid employees shall devote all of his time and attention, and best efforts, to the business of the corporation, and shall not thereafter, during the term of employment, either directly or indirectly, engage in any other business.

5.4 Carnicelli expressly agrees that for a period of two (2) years following the termination of his employment by this Corporation (however the same may occur) he will not, directly or indirectly, for himself or as agent or employee of, or on behalf of or in conjunction with, any person, firm, association or corporation, (a) engage, solicit or otherwise deal with any employees or clients of the Corporation or of any affiliated entity or entity in which John Fareri is a principal, member, shareholder or partner, (b) interfere with any business relationships by or between any of the foregoing persons or entities, or (c) disclose any trade secrets or proprietary information concerning the Corporation.

5.5 All parties hereto recognize that the respective services to be rendered by each of the employees under this agreement are special, unique and of extraordinary character.

6. Restrictions.

6.1 Except with the written consent of all other parties to this Agreement or as otherwise contemplated herein, no Shareholder shall pledge, encumber, hypothecate or transfer, by sale, gift, bequest, assignment, operation of law (including, but not limited to, intestacy and divorce) or otherwise (any and all of the above hereinafter referred to as a "Disposition"), any Shares now or hereafter owned by him or any interest therein except in accordance with this Agreement. If no provision of this Agreement governs the proposed Disposition, then such Disposition shall be deemed to be prohibited by this Agreement, except with the written consent of all other parties to this Agreement.

6.2 The parties agree that they shall not cause or permit the transfer on the books of the Corporation of any Shares now or hereafter owned by any Shareholder, unless the transfer is made in accordance with this Agreement and the proposed Shareholder becomes a party to this Agreement.

7. Allocations and Distributions.

7.1 Upon the issuance, transfer or other Disposition of Shares other than on the first day of the Corporation's fiscal year (the "Fiscal Period"), items of income, gain, loss, deduction or credit for that Fiscal Period shall be allocated among the Shareholders to reflect their varying interests in the Corporation during the Fiscal Period. For purposes of computing the varying interests of each Shareholder, the Corporation shall make an interim closing of its books as of the effective date of the issuance, transfer or other Disposition of Shares and compute the items of income, gain, loss, deduction or credit applicable to the period of time before and after that date using the accrual method of accounting. Any issuance, transfer or other Disposition of Shares shall be effective as of the first day of the calendar month nearest the date of such issuance, transfer or other Disposition.

7.2 During the first two and one-half months of each Fiscal Period, the Corporation shall make a distribution (the "Tax Distribution") to each Shareholder from Distributable Cash (as defined herein), if any, equal to the maximum combined federal and state income tax rate applicable to the Shareholders, as determined annually by the Corporation's public accountants multiplied by the excess, if any, of the items of income and gain of the Corporation allocated to the Shareholder over any items of loss or deduction of the Corporation allocated to the Shareholder for the immediately preceding Fiscal Period (the "Net Income"). For these purposes, the Corporation's Net Income for a Fiscal Period shall be reduced by the excess, if any, of the aggregate losses and deductions allocated to the Shareholder by the Corporation for any preceding Fiscal Period over the aggregate income and gain allocated to the Shareholder by the Corporation for any preceding Fiscal Period. A Shareholder's Tax Distribution shall be reduced by: (a) the amount of tax credits, if any, allocated to him, for the preceding Fiscal Period; and (b) the sum of all distributions (which shall not include amounts paid as salary or expense reimbursements) made to the Shareholder by the Corporation during the immediately preceding Fiscal Period other than the Tax Distribution made during the immediately preceding Fiscal Period with respect to the second preceding Fiscal Period. As used herein, Distributable Cash shall mean all cash generated by sales of assets of, insurance proceeds paid to, or operations of

the Corporation, less; (a) cash required to make payments then due on accrued liabilities and obligations of the Corporation; (b) amounts that are prohibited from being distributed to the Shareholders pursuant to any agreement between the Corporation and any lender to the Corporation; and (c) any cash reserves as shall be established by the President of the Corporation with the approval of the Shareholders. The Corporation shall not be required to incur a liability for the purpose of providing the funds necessary to make a Tax Distribution.

8. Disposition at Death.

8.1 In the event of the death of Carnicelli, within 30 days following the due qualification of an executor or administrator for Carnicelli's estate, Carnicelli's executor or administrator shall sell, and Fareri shall purchase, Carnicelli's Shares, upon the terms and conditions set forth in Article 10 below.

8.2 In the event of the death of Fareri, Fareri's personal representative, executor, administrator or successor in interest shall have the right to transfer Fareri's Shares to Fareri's beneficiaries, spouse, child, grandchild and/or spouse of a child or grandchild and/or a trust for the benefit (exclusively) for any of the foregoing.

9. Involuntary Lifetime Disposition.

9.1 If (a) voluntary proceedings by or involuntary proceedings against any Shareholder are commenced under any provision of any federal or state act relating to bankruptcy or insolvency, or (b) any Shares of any Shareholder are attached or garnished, or (c) any judgment is obtained in any legal or equitable proceeding against any Shareholder, including any matrimonial action, and the transfer or sale of any of his Shares is contemplated under legal process as a result of such judgment, or (d) any execution process is issued against any Shareholder or against any of his Shares, or (e) any other form of legal proceeding or process is commenced by which any Shares of any Shareholder may be required to be transferred or sold either voluntarily or involuntarily, then the Shareholder involved, or his conservator, trustee or legal representative, shall give to each of the other parties hereto notice that an event contemplated by this Section 9.1 has occurred, specifying the nature of the event. Each of the other Shareholders shall then have the option, exercisable by giving notice to each of the other parties hereto within 30 days following the date on which such notice is given, to purchase the Shares involved in such event upon the terms and conditions set forth in Article 10 below.

10. Terms and Conditions of Purchases.

10.1 The closing of any purchase of Shares made under this Agreement shall take place at a time and place mutually agreeable to the seller and each buyer, but in no event shall a closing under (a) Article 9 of this Agreement take place later than 30 days following the giving of the latest notice of exercise of an option in respect of the particular transaction (b) Article 8 of this Agreement take place later than ninety (90) days after qualification of a legal representative

to administer the estate of the deceased. In the absence of an agreement to the contrary, the closing shall take place at the offices of the Corporation.

10.2  The per share purchase price to be paid for Shares purchased pursuant to Articles 8 or 9 of this Agreement shall be the Agreed Price of a Share as determined below as of the date of the occurrence of the event giving rise to the purchase of such Shares pursuant to this Agreement (the "Effective Date"). For the purposes of this Agreement, the "Agreed Price of a Share" shall be determined as follows:

(a) the Shareholders shall execute, within ninety (90) days after the close of each fiscal year of the Corporation, a Certificate of Value in substantially the form annexed hereto as Exhibit A, setting forth the agreed value and purchase price per Share, as of the date of such Certificate of Value, of Shares purchased pursuant to this Agreement. The Shareholders hereby agree that such value and purchase price as of the date hereof is $ 9.80 per Share, and that such agreement shall constitute the execution of a Certificate of Value dated the date hereof;

(b) if at any time an event occurs which gives rise to the purchase of Shares pursuant to this Agreement, and there exists a Certificate of Value dated less than two years before the date of such event, then the most recent such Certificate of Value shall be deemed to establish conclusively the agreed value and purchase price per Share;

(c) in the event that an effective Certificate of Value, as described in clause (a) above, does not exist on the date of the occurrence of the event giving rise to a purchase of Shares pursuant to this Agreement, then the purchase price of a Share shall be the Corporation's net book value per Share determined by the Corporation's regularly engaged public accountants in conformity with generally accepted accounting principles as of the close of the Corporation's fiscal year immediately preceding the Effective Date. Such determination shall be deemed to establish conclusively the agreed value and purchase price per Share.

10.3  The per share purchase price to be paid for Shares purchased pursuant to Article 9 of this Agreement shall be the lesser of the purchase price per Share set forth in the Offer (with any non-cash consideration to be valued at its fair market value by the good faith determination of the Corporation's Board of Directors) or the Agreed Price of a Share determined in accordance with Section 10.2.

10.4  Payment of the purchase price for any Shares purchased pursuant to this Agreement shall be made by each buyer as follows:

(a) an amount equal to at least 25 percent of the aggregate purchase price to be paid by such buyer shall be paid to the seller in cash or by certified check at the closing; and

(b) the balance of the aggregate purchase price to be paid by such buyer shall be paid by delivery to the seller at the closing of a promissory note in the form attached hereto as Exhibit B duly executed by such buyer, providing for payment of the balance in four equal successive annual installments with concurrent interest payments on the unpaid balance at a fixed rate of interest equal to the prime rate in effect at the end of the month preceding the closing date at the commercial bank which is then the principal depository of the Corporation's funds. The obligations evidenced by such promissory note shall be secured by a pledge of the Shares being purchased, and the buyer and seller shall execute and exchange at the closing a pledge agreement in the form customarily used by such commercial bank or such other form as may be mutually agreeable to the buyer and seller; and

(c) notwithstanding the foregoing payment terms, if the Shares are being purchased pursuant to Article 8 above, then the aggregate purchase price to be paid by the surviving Shareholders shall be paid in full to the seller in cash or by certified check at the closing.

10.5 The transferee of any Shares pursuant to this Agreement shall be bound by all of the terms and conditions of this Agreement as they apply to the Shareholders and, as a condition to such transfer, shall agree in writing to become a party to this Agreement and shall execute a copy of this Agreement.

10.6 At the closing, and upon receipt of the consideration therefor, the seller shall deliver to each buyer, free and clear of any and all liens, claims, charges, encumbrances and security interests, all certificates representing the Shares being purchased by him, properly endorsed for transfer and with all necessary transfer tax stamps affixed (or funds in lieu thereof provided).

11. Buy-Sell.

11.1 Any Shareholder ("Offeror") has the right at any time to give notice ("Notice") to the other Shareholders (the "Offerees" and individually, an "Offeree") and to the Corporation. The Notice shall contain the following:

(a) an offer by the Offeror to purchase all of the Shares beneficially owned by the Offerees ("Offer to Purchase");

(b) an offer by the Offeror to sell all of the Shares beneficially owned by the Offeror to the Offerees *pro rata* based upon the number of Shares beneficially owned by the Offerees ("Offer to Sell); and

(c) the price to be paid for each Share pursuant to the Offer to Purchase and the Offer to Sell, which shall be the same for both offers ("Purchase Price").

11.2     Within 10 business days of Notice being given, each Offeree is entitled to accept either the Offer to Purchase or the Offer to Sell by giving notice of such acceptance to the Offeror, to the other Offeree and to the Corporation.

11.3     If the Offerees accept the Offer to Purchase, the Offerees shall sell and Offeror shall purchase all of the Shares beneficially owned by each Offeree at the Purchase Price and the transaction of purchase and sale shall be completed within 20 business days of the expiration of the 10 business day period specified in Section 11.2. The transaction shall be completed at the Corporation's principal offices where the Offerees shall deliver the Shares with good, free and clear title and shall receive payment by official bank check or wire transfer from the Offeror.

11.4     If the Offerees accept the Offer to Sell, the Offerees shall purchase, *pro rata,* based upon the number of Shares beneficially owned by the Offerees, and the Offeror shall sell all of the Shares at the Purchase Price and the transaction of purchase and sale shall be completed within 20 business days of the expiration of the 10 business day period specified in Section 11.2. The transaction shall be completed at the Corporation's principal offices where the Offeror shall deliver the Shares with good, free and clear title and shall receive payment by official bank check or wire transfer from the Offerees.

11.5     If any Offeree does not accept either the Offer to Purchase or the Offer to Sell within the 10 business day period specified in Section 11.2, that Offeree shall be deemed to have accepted the Offer to Purchase of the Offeror and to have given notice of such acceptance pursuant to the provisions of Section 11.2 on the last business day upon which such notice may have been given.

11.6     If one Offeree accepts or is deemed to have accepted the Offer to Purchase pursuant to the provisions of Section 11.2 or Section 11.5 respectively, ("Selling Offeree") and another Offeree accepts the Offer to Sell of the Offeror pursuant to the provisions of Section 11.2 ("Purchasing Offeree"), the Purchasing Offeree shall be entitled to purchase the Shares beneficially owned by the Offeror and the Shares beneficially owned by the Selling Offeree by giving notice of the exercise of that right to the Offeror, the Selling Offeree and to the Corporation within 10 business days of the expiration of the 10 business day period specified in Section 11.2 and, if the Purchasing Offeree gives notice pursuant to the provisions of Section 11.6, the Offeror and the Selling Offeree shall sell the Shares beneficially owned by them to the Purchasing Offeree and such transaction of purchase and sale shall be completed within 20 business days of the date upon which the Corporation was given such notice by the Purchasing Offeree. The transaction shall be completed at the Corporation's principal offices where the Offeror and the Selling Offeree shall deliver the Shares with good, free and clear title and shall receive payment by official bank check or wire transfer from the Purchasing Offeree.

11.7     If the Purchasing Offeree fails to give notice under Section 11.6 within the 10 business day period, the Purchasing Offeree shall be deemed to have accepted the Offer to Purchase, and not accepted the Offer to Sell, and the provisions of Section 11.3 shall apply to both Offerees except that the transaction of purchase and sale shall be completed within 15 business days of the expiration of the 10 business day period specified in Section 11.6.

11.8     If any Shareholder obliged to sell under Section 11 ("Selling Shareholder") defaults in transferring all or any of the Shares to a Shareholder obliged to purchase under Section 11 ("Purchasing Shareholder"), the Secretary of the Corporation is directed to receive the purchase money and enter the name of the Purchasing Shareholder in the books of the Corporation as the holder of the Shares. The purchase money shall be held in trust by the Corporation on behalf of the Selling Shareholder and shall not be comingled with the Corporation's assets. The receipt by the Secretary of the purchase money shall be deemed full performance by the Purchasing Shareholder and, after the name has been entered in the books of the Corporation, the validity of the transaction shall not be questioned by any person. As of the date of transfer of the shares on the books of the Corporation, the Selling Shareholder ceases to have any right to the Shares except the right to receive the purchase price received by the Secretary of the Corporation.

11.9     Two of the Shareholders may jointly give a Notice to another Shareholder under Section 11.1 and, in such event, the further provisions of Section 11 shall apply except that any Shares purchased by them under Section 11 shall be *pro rata* based upon the number of Shares beneficially owned by the Shareholders who gave the Notice.

11.10    Two of the Shareholders may jointly accept the Offer to Sell under Section 11.2 and, in such event, the further provisions of Section 11 shall apply except that the number of Shares to be purchased by each of them under Section 11 may be set out in the notice given by them under Section 11.2 and Section 11.9 provided that the aggregate of such numbers equals the number of Shares beneficially owned by the Offeror.

12.     Legends.

Every certificate representing any Shares of the Corporation, whether such certificate is now or hereafter issued to any Shareholder, shall bear the following legend:

> "TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS RESTRICTED BY THE TERMS OF A CERTAIN SHAREHOLDERS' AGREEMENT DATED AS OF JANUARY 1, 2014 AMONG THE CORPORATION AND ITS SHAREHOLDERS, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION."

13.     Termination.

13.1    This Agreement shall terminate immediately upon the earliest to occur of the following events:

(a)     the bankruptcy, receivership, liquidation and/or dissolution of the Corporation; or

(b)     the execution by all of the parties hereto of a mutual agreement to terminate this Agreement; or

(c)     at any time if there is only one Shareholder.

13.2     This Agreement shall terminate with respect to any Shareholder, and he shall have no further rights or obligations hereunder immediately upon his or her Disposition, in any manner consistent with the provisions of this Agreement, of all of his Shares.

14.     Injunctive Relief.

The parties acknowledge that any breach of this Agreement will result in immediate harm to the other parties which will not be measurable or compensable in money damages. Therefore, if any party (or his legal representative) commences any action or proceeding to enforce the provisions of this Agreement, the party against whom the action or proceeding is brought hereby waives any claim or defense therein that the aggrieved party has an adequate remedy at law. In addition to any other legal remedy which may be available, the party commencing the action or proceeding shall be entitled to injunctive relief with respect to any breach or threatened breach of this Agreement and to specific performance of its terms.

15.     Benefit; Assignment.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns. Notwithstanding the foregoing, no party shall assign or attempt to assign this Agreement or any interest herein without the prior written consent of all of the other parties hereto.

16.     General Provisions.

16.1     Any notice given pursuant to this Agreement shall be in writing and shall be deemed to have been given when deposited for certified mail delivery in the United States mail with postage prepaid and addressed to the party for whom it is intended at his address as set forth on the records of the Corporation or at such other address as to which the parties may from time to time notify each other in like manner.

16.2     The masculine pronoun, whenever used herein, shall be construed to include both the feminine and the neuter, as appropriate to the context.

16.3     This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut applicable to agreements made and to be performed entirely within such State.

16.4     This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

16.5     The Article and Section headings in this Agreement are inserted for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

16.6    If any of the provisions of this Agreement are or become unenforceable, the remainder of this Agreement shall nevertheless remain binding to the fullest extent possible, taking into consideration the purposes and spirit of this Agreement.

16.7    This Agreement contains the entire understanding of the parties hereto with regard to the subject matter hereof, and may not be amended or modified, nor may any of its provisions be waived, except by a writing executed by all of the parties hereto or, in the case of a waiver, by each party waiving compliance.

16.8    Proper accounting records of all Corporation business shall be kept and shall remain open to inspection (or copying) by any of the Shareholders, or their designees or legal representatives, at all reasonable times.  At the end of each calendar year, a complete accounting of the affairs of the Corporation shall be furnished to each Shareholder, together with such appropriate information as may be required by each Shareholder for the purpose of preparing his income tax return for that year.   All matters of accounting for which there is no provision in this Agreement are to be governed by generally accepted principles of accounting applied on a consistent basis.

16.9    The books and records of the Corporation shall be kept at the principal place of business of the Corporation.

16.10   All checks of the Corporation in excess of $5,000.00 shall be signed by two officers of the Corporation.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, we have executed this Agreement on the day and year first above written.

THE GATEWAY DEVELOPMENT GROUP, INC.

By: _____
    Name: John J. Fareri, President

SHAREHOLDERS:

_____
John J. Fareri

_____
James Carnicelli, Jr.

EXHIBIT A

CERTIFICATE OF VALUE

      The undersigned, being all of the Shareholders of The Gateway Development Group, Inc. (the "Corporation") hereby agree that the purchase price per share of shares of the Corporation to be purchased in the coming fiscal year pursuant to the terms of the Shareholders' Agreement, dated as of January 1, 2014 by and among the Corporation and each of the undersigned shall be:

$ 9.80 per share.

This Certificate is dated as of January 1, 2014.