1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 21-22304-rdd

4    Adv. Case No. 21-07093-rdd

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    THE GATEWAY DEVELOPMENT GROUP, INC.,

9

10           Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   CARNICELLI, JR. ET AL,

13                 Plaintiff,

14          v.

15   SHESKIER ET AL,

16                 Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19                 United States Bankruptcy Court

20                 300 Quarropas Street, Room 248

21                 White Plains, NY 10601

22

23                 January 24, 2022

24                 11:49 AM

25

1    B E F O R E :

2    HON ROBERT D. DRAIN

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO:   ART

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    HEARING re Adversary proceeding: 21-07093-rdd Carnicelli,

2    Jr. et al v. Sheskier et al

3    Motion to Dismiss Adversary Proceeding file by Leonard

4    Benowich on behalf of John J. Fareri (ECF #11)

5

6    Opposition Brief Opposition Defendant John J. Fareri's

7    Motion to Dismiss (related document(s)11) filed by Joseph

8    Pastore on behalf of James Carnicelli, Jr. (ECF #14)

9

10   Reply Memorandum of Law in Support of John Fareri's Motion

11   to Dismiss all Claims Asserted by Plaintiff James Carnicelli

12   in his Individual Capacity (related document(s)11) filed by

13   Leonard Benowich on behalf of John J. Fareri. (ECF #15)

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    PASTORE LLC

4          Attorney for James Carnicelli Jr.

5          4 High Ridge Park

6          3rd Floor

7          Stamford, CT 06905

8

9    BY:  JOSEPH PASTORE III

10

11   BENOWICH LAW LLP

12          Attorney for Fareri

13          1025 Westchester Avenue

14          White Plains, NY 10604

15

16   BY:  LEONARD BENOWICH

17

18   DAVIDOFF HUTCHER CITRON LLP

19          Attorney for James Carnicelli Jr.

20          605 Third Avenue

21          New York, NY 10158

22

23   BY:  JAMES GLUCKSMAN

24

25

1  FORD HARRISON, LLP

2       Attorney for John J. Fareri

3       185 Asylum Street

4       Hartford, CT 061003

5

6  BY:  JOHANNA ZELMAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Okay.  The next matter on the calendar

3    is In re Gateway Development Group, Inc., and more

4    specifically, Carnicelli, Jr., et al vs. Sheskier, et al,

5    and that includes John J. Fareri as defendant.

6            And we're here on the defendants' motion to

7    dismiss all claims asserted by plaintiff, Carnicelli.  He's

8    not the only plaintiff in the adversary proceeding, but the

9    motion covers only his claims.

10           I have reviewed the motion and the memorandum in

11   support, the memorandum by the plaintiff in opposition, and

12   the reply.  So why don't I take -- just make sure I have all

13   the counsel on the line and then ask have there been any

14   further developments on the motion.

15           MR. PASTORE:  Good morning, Your Honor.  Joseph

16   Pastore for Mr. Carnicelli.

17           THE COURT:  Good morning.

18           MR. PASTORE:  Good morning.

19           MR. BENOWICH:  Your Honor, Leonard Benowich for

20   the movants.

21           THE COURT:  Good morning.

22           MS. ZELMAN:  Johanna Zelman for John Fareri.

23           THE COURT:  Good morning.

24           MR. GOLDMAN:  Good morning, Your Honor.  Irve

25   Goldman, Pullman & Comley, special litigation counsel to the

1   trustee, Howard Magaliff.

2           THE COURT:  Right.  Good morning.

3           MR. GLUCKSMAN:  James B. Glucksman for Mr.

4   Carnicelli.

5           THE COURT:  Okay.  But it's going to be --

6           MS. AISNER:  And Erica Aisner.

7           THE COURT:  I'm sorry.  Go ahead, Miss Aisner.

8           MS. AISNER:  Sorry.  Erica Aisner, Kirby Aisner &

9   Curley, counsel for affiliate, Gateway Kensington.

10           THE COURT:  Okay.  But it's going to be Mr.

11   Benowich and Mr. Pastore then would be the counsel arguing

12   this, right?

13           MS. AISNER:  I'm just here listening.

14           THE COURT:  Okay, all right.  And Mr. Benowich or

15   Mr. Pastore, have there been any further developments on the

16   motion?

17           MR. BENOWICH:  No, Your Honor.

18           THE COURT:  Okay, all right.  I'm happy to hear

19   brief oral arguments on the motion.

20           MR. BENOWICH:  Your Honor, this is Leonard

21   Benowich.  Thank you.  We certainly believe that we've

22   stated everything we would urge Your Honor in our briefs,

23   and unless you have a particular question, I would stand on

24   the briefs.

25           THE COURT:  Well, okay, that's fine.  And the

1   briefs were reasonably clear to me.  I guess I have a couple

2   of questions though.  First, as to the claims for -- well, I

3   separate the claims in the Complaint into two categories.

4           I appreciate that they are asserted under

5   different theories or sub-theories, but just based on the

6   facts asserted in the Complaint, I separate them into two

7   categories.  The first is Mr. Carnicelli's claims for either

8   breach of his employment agreement or entitlement to be paid

9   in respect of that employment agreement.

10          I appreciate that they're both breach of contract

11  and statutory claims, but they all tie into an alleged

12  breach of an agreement as set forth in the shareholder's

13  agreement that he be hired at $250,000 a year as the

14  president of the company and that essentially he can't be

15  terminated except for cause shown.

16          And then we have a second set of claims premised

17  upon his not receiving what he believes should be his 49

18  percent interest in, through distributions, dividends,

19  whatever, of the underlying corporation, which he and Mr.

20  Fareri were shareholders.  And I think related to that is

21  his claim premised upon the covenant in the shareholder's

22  agreement to keep accurate books and records.

23          And this is as much for Mr. Pastore as for you,

24  Mr. Benowich.  I tend to see for motion to dismiss purposes

25  life in the first set of claims, and I'm happy to discuss

1    that with you further though, but I'm having a hard time

2    seeing how the second set of claims can really be in any

3    respect asserted as claims of Mr. Carnicelli, as opposed to

4    derivative claims through the corporation.

5            So let me start with Mr. Benowich on the first set

6    of claims.  I know you have argued that the contract is with

7    the corporation.  It's the corporation that employed Mr.

8    Carnicelli, not Mr. Fareri.  But it appears to me that the

9    Complaint does make it clear that Mr. Fareri, by controlling

10   the corporation, caused, as alleged -- again, we're just

11   dealing with a motion to dismiss; obviously, this doesn't

12   have any bearing ultimately on the merits -- but caused Mr.

13   Fareri to be terminated and not paid.

14           So I guess a subset of that analysis would go to

15   the following points as well.  The motion tries to

16   distinguish between the provision that says that Mr.

17   Carnicelli will be president and cannot be terminated and

18   his right to be paid as an employee.

19           But it really does seem to me that that's -- I'm

20   not trying to be derogatory here -- but too cute an argument

21   given the language of the agreement.  I mean, he's only

22   employed in one capacity, as president; he has only one

23   salary and he can't be terminated, except for cause.

24           And further, even if one were to make a

25   distinction between an employee and an officer, the only

1    place it's made is in heading and the headings aren't part

2    of the agreement.  So I think he does have a right to be

3    paid and not to be terminated for cause.  Then the issue is,

4    is that right only against the corporation.

5            It seems to me there's certainly enough facts

6    alleged here to show that: (a) Mr. Fareri caused his

7    termination, directed it; and (b) that he was -- basically,

8    it overlaps with (a), he was in the position to do that.  He

9    was effectively the decisionmaker as to employment, although

10   contrary to the parties' agreements.

11           To me, that puts liability on him, as opposed to

12   the corporation.

13           I'll note that the Complaint doesn't allege

14   specifically tortious interference and there may be an

15   element of bad faith that would need to be alleged under

16   Connecticut law for tortious interference, but the facts

17   seem to lay out a tortious interference claim even separate

18   from the claim under Section 31-71 and 72.

19           On that point on the statutory claim, it does

20   appear from the Complaint, at least the Complaint doesn't

21   allege that Mr. Carnicelli is owed anything for services

22   rendered pre-termination.  They're looking instead -- or the

23   Complaint is instead looking for money accruing post-

24   termination, and the statute does say wages means

25   compensation for labor or services rendered, which is a past

1    tense verb.

2              But there is case law, including pretty recent

3    case law, that interprets this statute -- again, Section 31-

4    71 and 72 under the general statutes of Connecticut -- to

5    apply to future wages where an employer in bad faith

6    terminates an employee that would otherwise be entitled to

7    them to prevent him or her from getting paid those future

8    wages.  For example, Harty v. Cantor Fitzgerald & Co., 275

9    Conn. 72, 102-105 (2015), and Butler v. Cadbury Beverages,

10   Inc., 119 U.S. Lexis 16098 (D. Conn., June 30, 1999).

11             And then we have the good faith claim, which in

12   essence is the similar type of -- the good faith and fair

13   dealing claim, which in essence is the similar type of

14   argument that those courts apply in the Section 31-71 and 72

15   context, i.e., you can't defeat the purpose of the contract

16   by breaching the covenant of good faith and fair dealing.

17   You can't thwart a party's performance of it by taking an

18   action in bad faith to deprive a party of the contract.

19             Now, often -- I mean, sort of the quintessential

20   fact pattern for breach of covenant of good faith and fair

21   dealing is where the parties have an agreement to sell

22   something and one party just refuses to go to the closing,

23   you know, thwarting performance.

24             But it would appear to me that, as far as the

25   wages claim is concerned, it's either one way or another,

1    those claims survive.  I'm having a much harder time seeing

2    the other causes of action here, but maybe we should deal

3    with those at stage two when I hear from Mr. Pastore on

4    them.

5            But I don't know if you have a response on the

6    first set of claims, Mr. Benowich.

7            MR. BENOWICH:  Thank you, Judge.  I do.

8            I understand Your Honor's point on who the

9    employer is, and that Mr. Fareri may well control the

10   actions of that corporation.  But what this claim, which

11   sounds and contract seems to do, is to really assert a

12   claim, as Your Honor came to at the end of your reasoning,

13   for tortious interference.

14           And the problem I have with that is that Mr.

15   Fareri is, to borrow a phrase we use more in New York than

16   they may in Connecticut, he's not a stranger to the

17   relationship.  In other words, tortious interference is

18   usually applied against someone who is not a party to or

19   controlling a party to a contract and induces its breach for

20   the benefit of a third party.  We don't have that here.

21           I understand the allegations.  I understand Your

22   Honor's analysis of it.  But there would be no other way for

23   this Debtor, this corporation, to act but by Mr. Fareri's

24   actions, and that's why I believe it's not a breach of

25   contract certainly by him and I don't think tortious

1    interference applies for the reasons I articulated.

2              THE COURT:  Well, the parties really haven't

3    briefed tortious interference, so I'm not prepared to say

4    that such a claim would survive here, but it does seem to me

5    that the Complaint could be amended to allege that.

6              But as far as breach of contract is concerned, it

7    may be that the contract claim doesn't survive and that you

8    have to rely on 71 and 72 and the good faith claim.

9              Mr. Pastore, what's your view on the contract

10   point?

11             MR. PASTORE:  Well, I certainly --

12             THE COURT:  The contract, I know you say, is not

13   only with the corporation, but also with Fareri, who signed

14   in his own capacity as well, right?

15             MR. PASTORE:  Good morning.  I guess good

16   afternoon now, Your Honor.  Thank you.

17             I agree with your analysis.  Mr. Fareri is a

18   signatory to the contract.  The provisions of the contract

19   talk about his position -- Mr. Carnicelli's position as

20   president and that he can't be terminated.

21             I think at the pleading stage, we've certainly

22   pled a breach of contract, but with the discovery, the

23   interpretation of those provisions changes.

24             THE COURT:  And that's solely based on the fact

25   that Fareri's a signatory in his own capacity, so the

1   parties, you're saying, at least from the one interpretation

2   of the contract, understood that Fareri himself was ensuring

3   -- was agreeing to ensure that he would, in his personal

4   capacity, agree that Carnicelli couldn't be dismissed unless

5   for cause?

6           MR. PASTORE:  I think that's the only way to, at

7   least at the pleadings stage, interpret his signature on the

8   contract and the agreement.

9           THE COURT:  I mean, Mr. Benowich, why else would

10  he sign in his own capacity, as well as their shareholder

11  and share?

12          MR. BENOWICH:  He didn't sign otherwise, Judge.

13  He signed twice: once in a representative capacity for the

14  corporation, as he was at that time its president before

15  this takes effect, and the other one is as a shareholder.

16  And as a shareholder, he didn't have the right to do what is

17  alleged to have been done.  He is not -- as an individual,

18  he is not the employer who is guarantying the corporation's

19  (sound glitch).

20          THE COURT:  Well, except he's the controlling

21  shareholder and he did direct those acting for the

22  corporation to shut it down and not pay Carnicelli.

23          MR. BENOWICH:  Assuming that that's the case, Your

24  Honor, still, how else can a corporation act?  It's very

25  basic.  The individual officers who direct a corporation's

1  actions are not liable for that corporation's breach of a

2  contract that they direct unless --

3        THE COURT:  Right, unless they separately contract

4  it.

5        MR. BENOWICH:  And he hasn't.  A shareholder who -

6  - Mr. Fareri otherwise signed only in his shareholder

7  capacity.  A shareholder isn't ratifying or guarantying the

8  corporation's contract.

9        THE COURT:  How do I know that?  I don't --

10        MR. BENOWICH:  Because he signed in his capacity

11  as a shareholder the same way that Mr. Carnicelli did.

12        THE COURT:  But so what?  I mean, he signed it

13  though in his own capacity.

14        MR. BENOWICH:  He signed it in a specified

15  capacity.  If it had just said John Fareri, I would think

16  maybe Mr. Pastore has a stronger argument.  But signing it

17  as a shareholder because this is a composite agreement, it

18  does have the employment component and it has the

19  shareholder rights component, and that's why it designates

20  them as signing shareholders.

21        THE COURT:  Well, okay.  We started that off on

22  just the breach of contract point.

23        MR. BENOWICH:  Yes.

24        THE COURT:  Do you have other responses?

25        MR. BENOWICH:  On the statutory claim, Your Honor,

1   I respectfully believe -- and I can't pull to mind the cases

2   Your Honor cited, but the Gaison case which we refer to --

3   in my reading of it referred to an effort to interdict the

4   payment of an earned wage.  And that's why we pointed to

5   that case with the doctor against the hospital because the

6   claim there, unlike Mr. Carnicelli's, was that he was going

7   to be paid $5.5 million paid out over five years.  That's

8   not what this Complaint alleges.

9          This Complaint alleges he would get an annual

10  salary of 250.  And I'm not sure -- and I, you know,

11  certainly will go back and look -- but I don't remember

12  seeing cases which allow a claim for wages or commissions

13  that had not yet been earned to be the subject of a claim

14  under 31-71 or 2.

15          THE COURT:  Yeah.  No, I actually think there are.

16  I mean, I think -- well, the ones I cited, plus Pereira v.

17  DSL Net, 2000 Ct. Sup. Lexis 2050 (July 28, 2000).

18          MR. BENOWICH:  I'm sorry.  Those weren't in Mr.

19  Carnicelli's brief.

20          THE COURT:  Well, I know, but we do our own

21  research too.

22          MR. BENOWICH:  No, no, no, I understand.  I'm just

23  looking for the cite.

24          THE COURT:  You know, those were unvested stock

25  options in that case.  And again, similar to the Cadbury

1    Beverages case, the Court said they would have been earned,

2    but for the employer's alleged wrongful termination because

3    they were in a contract, the contract was locked in.

4            Now there's an issue here because this is a

5    forever contract.  I think there might well be some

6    limitation on that.  I appreciate that.  But, frankly, there

7    are limitations in bankruptcy cases too in claims against

8    the Debtor, but of course, this is against Mr. Fareri.

9            But again, given -- I mean, I do think that the

10   Court in Connecticut has expanded on the language of the

11   statute, which is in the past tense, services rendered, to

12   basically build in a good faith and fair dealing covenant.

13   But I also note that Mr. Carnicelli has pledged the good

14   faith and fair dealing claim as well.

15           And on that point, again, there may be other

16   reasons why this termination wasn't in bad faith, wasn't

17   contrary to public policy and the like.  But it seemed to me

18   that the Complaint alleged sufficient facts to show that it

19   was, i.e., Mr. Carnicelli kept stating you're not dealing

20   with me fairly as a shareholder and finally, he was

21   terminated because he was being a thorn in everyone's side.

22   Now it may be that those Complaints were not justified, and

23   the facts will ultimately show that he was properly

24   terminated.

25           But as alleged here, it really does seem that the

1  termination is pretextual when there's no real reason given

2  for it, other than just it's for the good of everybody sort

3  of the letter that's quoted.

4          I mean, there is a state -- the motion does or the

5  objection to the reply -- I'm sorry.  The objection asserts

6  that the Complaint is inconsistent and that it takes the

7  view that he was terminated, and at the same time, he's owed

8  ongoing funds.  I don't think that rises to the level of

9  judicial admission or a waiver, you know, a known waiver of

10  an argument.

11          But I think, given the case law, it's hard for me

12  to see how the wage claim can be dismissed given the

13  allegations in the Complaint.  You know, conceivably, it

14  could be an issue that ultimately would go to the --

15  although I can't do this, it would have to be the Circuit --

16  go to the Connecticut Supreme Court to clarify, but it might

17  not.  I mean, it depends on the facts, I think, in large

18  part.  So I guess the other aspect of my analysis is really

19  more in the movant's favor.

20          So Mr. Pastore, I'm having a hard time with the

21  notion that the other claims, the claims related to keeping

22  accurate books and records and the alleged breach of an

23  agreement to share as shareholders on a 51/49 percent basis,

24  isn't really derivative.

25          But before I get there, I think there are a couple

1   of other points.  First, as to the fraud claim, I don't see

2   how the applicable statute of limitations here for fraud

3   would be tolled.  I appreciate there's a continuing course

4   of conduct doctrine in Connecticut, but I don't see alleged

5   in the Complaint for purposes of Rule 9, compliance with

6   Rule 9 for a continuing fraud.

7           I do think you've satisfied Rule 9 as to the

8   initial fraud that's alleged.  You know when that happened,

9   who mad the statement, et cetera; that's the entry into the

10  agreement, the shareholder's agreement.  And you allege that

11  Mr. Fareri had no intention of complying with that agreement

12  and you, I think, plead sufficient facts in which one could

13  infer that intent.

14          But that was well beyond -- that original fraud is

15  well beyond the limitations period from when this Complaint

16  was filed, and I don't think the Complaint alleges

17  continuing representations to satisfy Rule 9 and in order to

18  get, you know, the tolling for a continuing fraud exception

19  to it.  And again, the Complaint itself alleges that he's

20  complaining about these things, and it seems to be more than

21  three years before the Complaint was filed.

22          So I'm just having a -- so as far as fraud is

23  concerned, I don't see that cause of action being

24  sufficiently pled here.  And then as far as the shareholder

25  rights, that seems to be derivative of the corporation, and

1   the books and records I think probably is too.  But in any

2   event, no damages are pled there, so it's hard for me to see

3   a claim.  I don't see -- there's no allegation that Mr.

4   Carnicelli was damaged by the inaccurate books and records.

5           So I don't know if you have a response to those

6   points.

7           MR. PASTORE:  Sure, thank you.  Well, with respect

8   to the contract, I think the way we look at it is that Mr.

9   Carnicelli is entitled to the benefit of his bargain, and he

10  bargained as a shareholder to be able to receive the

11  benefits set forth therein, which included the books and

12  records, which included the operation of the business.  He's

13  a separate person from the company.

14          We obviously stand by the derivative claim being

15  pursued by the Trustee, but Mr. Carnicelli is a party to

16  that contract and is entitled to the benefit of the bargain

17  he contracted for, which includes obtaining the books and

18  records, for example, not having to chase them, which

19  includes his position, et cetera.

20          With respect to the damages of not obtaining the

21  books and records, I think that's woven into the whole

22  misfire or misplacement of all the proceeds of all the

23  projects and ability to track it.  And I don't think we can

24  certainly tell you what the damage is today, but I think

25  it's interwoven.  And by breaching that provision, it's made

1    it more difficult for Mr. Carnicelli (sound drops).

2            With respect to the fraud claim, continuing course

3    of conduct, I just -- what Your Honor said, which is he's

4    complaining about it; he's complaining about it because it's

5    continuing.  And maybe we should have put a line in there

6    that said, like, he was told it'll all be okay because

7    that's what he was told.

8            THE COURT:  Well, that's not there; that's the

9    problem.

10            MR. PASTORE:  Yeah.  I don't disagree with that.

11    I mean, that's the facts, but we did not put he was told it

12    was going to be all okay.  I think it's implicit in the

13    discussion, but it's (sound drops).

14            THE COURT:  Okay.  Well, as far as the -- I mean,

15    I guess the one area that I again have a potential here for

16    seeing a claim for breach of the agreement by Mr. Fareri is

17    the good faith and fair dealing cause of action.  But I just

18    -- see, to me I guess, this is one where they are I think

19    acting as shareholders; in other words, they expect the

20    shareholders to get their shares.

21            And I'm not sure how he's breaching the covenant -

22    - or the cause of action, which is the covenant of good

23    faith and fair dealing where he's acting as a shareholder.

24            MR. PASTORE:  Well, every contract under

25    Connecticut law has that covenant.  And I think it's telling

1    in the Complaint and make clear, he didn't call a board of

2    directors meeting or follow appropriate corporate procedure

3    in order to suspend operations of the company, which is the

4    language they use, and the Complaint says that, no board

5    meetings.

6            If he had called a board meeting, appointed a new

7    president and had that president take action against Mr.

8    Carnicelli, it's different.  But he's acting unilaterally in

9    his position as an officer as a result of being a

10   shareholder and he's acting unilaterally in derogation of

11   the Connecticut contact, which has a covenant that says you

12   must behave in good faith under this contract.

13           THE COURT:  But the contract here is that they

14   divide the earnings 51/49, right?

15           MR. PASTORE:  In the contract is they divide the

16   earnings 51/49.  The contract is that don't terminate my

17   employment as expressed in the contract.

18           THE COURT:  No.  I think I understand that because

19   there's a separate agreement there, right?

20           MR. PASTORE:  Right.  It's the same document, but

21   yeah.

22           THE COURT:  It's in the same document, but there's

23   an employment contract.

24           MR. PASTORE:  Right.

25           THE COURT:  But the other relationship is one

1    where both parties are just shareholders.

2              MR. PASTORE:  Right.  But one shareholder is

3    purposely taking action to deprive the other shareholder of

4    monies that he controls outside of the company.  And so,

5    yes, the company has a derivative claim against him, but Mr.

6    Carnicelli's also entitled to the benefit of his bargain

7    which is being frustrated by the other shareholder.

8              THE COURT:  Even though his bargain is just a

9    bargain from the corporation to -- a bargain among the

10   shareholders of the corporation to share their shares.

11             MR. PASTORE:  Right.  But the other shareholder is

12   purposely frustrating the company's ability to obtain that

13   money to then honor the contract.

14             THE COURT:  Okay.

15             MR. PASTORE:  Mr. Fareri could have not breached

16   his fiduciary duty and the company could have been paid

17   millions of dollars and he could have decided we're going to

18   build a statue to himself outside, instead of --

19             THE COURT:  But again, it's based on his -- see,

20   it's based on his fiduciary duties to the company.  I mean,

21   I just think when two shareholders are agreeing as to the

22   allocation of shares, yes, they're fiduciaries, sort of the

23   controlling parties of fiduciary and is bound to act as a

24   fiduciary.

25             But to me, it seems a stretch to say that the

1   other shareholder has a contract right against him where

2   he's signing as a shareholder and they're both dealing with

3   each other in this capacity as shareholders, as opposed to

4   the other one where Carnicelli is also an officer with an

5   employment contract.

6           MR. PASTORE:  But in that very contract -- and I

7   appreciate it, it's a very interesting question.  In that

8   very contract, the shareholder is saying you'll 49 percent

9   of our profits.  And at the same time he's saying that, the

10  Complaint alleges, he's purposely withholding any monies

11  from the company so as to give him that 49 percent.

12          THE COURT:  Do you have any cases that fall into

13  this construct?

14          MR. PASTORE:  Obviously, we put case in the brief.

15  I'm just trying to think (sound drops) mark.

16          THE COURT:  I mean, I think -- I mean, I don't

17  think there were; let's put it that way.  Nothing leaped

18  out.

19          MR. PASTORE:  Fair.  I mean, I think there are

20  cases that talk about the fact that Connecticut -- I think

21  New York does similar -- has the covenant of good faith and

22  fair dealing implicit in every contract.

23          THE COURT:  Right.

24          MR. PASTORE:  And so, Mr. Fareri signed a contract

25  that said Mr. Carnicelli will be entitled to 49 percent and

1   then he purposely took action as an individual.

2           THE COURT:  But there are lots of -- I mean, it's

3   quite customary for there to be shareholder agreements --

4           MR. PASTORE:  Right.

5           THE COURT:  -- where shareholders sign as

6   shareholders to do X, Y, and Z.  I'm not seeing, and I don't

7   think I've had cited to me, a case that says that the

8   shareholders themselves are liable if they cause, through

9   breach of fiduciary duty, the shareholder agreement not to

10  be performed.  And I would think there would be if -- you

11  know, because that's a pretty important corporate point.

12          MR. PASTORE:  No, I understand.  Understand.  I

13  think, again, the way we look at it is that Mr. Carnicelli

14  is seeking the benefit of his bargain with Mr. Fareri, and

15  Mr. Fareri defeated that or frustrated that purposefully.

16          THE COURT:  All right.

17          MR. PASTORE:  And I apologize, I don't have a case

18  I can point to.

19          THE COURT:  Yeah, okay.  Do you have anything more

20  to say on this, Mr. Benowich, these points?

21          MR. BENOWICH:  No, Your Honor.

22          THE COURT:  Okay.  All right.  I have before me a

23  motion by the defendants in this adversary proceeding -- I'm

24  sorry -- the defendant John J. Fareri's motion in this

25  adversary proceeding to dismiss the claims by the plaintiff,

1    James Carnicelli, Jr. against him in the Complaint.

2          When considering a motion under Rule 12(b)(6),

3    which this is, as incorporated by Bankruptcy Rule 7012, the

4    Court must assess the legal feasibility of the Complaint,

5    not where the evidence that might be offered in it support.

6    Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d. Cir. 1999).

7          The Court's consideration is limited to facts

8    stated on the face of the Complaint and to the documents

9    appended to the Complaint or incorporated in the Complaint

10   by reference, as well as to matters in which judicial notice

11   may be taken.  Hertz Corp. v. City of New York, 1 F3d 121,

12   125 (2d Cir. 1993) Cert denied 510 U.S. 1111 (1993).

13         The Court accepts the Complaint's factual

14   allegations as true and must draw all reasonable inferences

15   in favor of the plaintiff.  Tellabs, Inc. v. Makor Issues &

16   Rights, Ltd., 551 U.S. 308, 323 (2007).  However, the

17   Complaint's allegations are clearly contradicted by

18   documents incorporated into the pleadings by reference, the

19   Court need not accept them.  Labajo v. Best Buy Stores, LP,

20   478 F.Supp. 2d 523, 528 (S.D.N.Y. 2007).

21         But one must be careful to distinguish between a

22   document that contradicts a Complaint's statement of what it

23   contains and a document that contradicts a Complaint's

24   factual allegation only if the document is assumed to be

25   true.  Only the former warrants dismissal of the Complaint,

1    not the latter because a motion to dismiss is not a vehicle

2    for the Court to make factual findings.  Roth v. Jennings,

3    489 F.3d 499, 510-11 (2d Cir. 2007).  See also, Deutsche

4    Bank Trust Co. Ams. v. Large Private Beneficial Owners (In

5    re Tribune Co. Financial Conveyance Litig.), 946 F.3d 6675,

6    Note 5 (2d Cir. 2009), and United States v. Strock, 92 F.3d

7    51, 63 (2d Cir. 2020).

8            Moreover, the Court is not bound as accept as true

9    a legal conclusion couched as a factual allegation.  Papasan

10   v. Allain, 478 U.S. 265, 286 (1986).  Instead, the Complaint

11   must state more than, "labels and conclusions, and a

12   formulaic recitation of the elements of the cause of action

13   will not do."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544,

14   555 (2007).

15           Under Federal Rules of Civil Procedure 8, a

16   Complaint need not set forth any particular statute or legal

17   theory describing its claims; rather, it must contain only

18   sufficient factual references to show that the plaintiff may

19   be entitled to some form of relief.  Townsend v. Benjamin

20   Enterprises, Inc., 679 F.3d 4156 (2d Cir. 2012), and Tolle

21   v. Carroll Touch, Inc., 977 F.2d 1129, 1134 (7th Cir. 1992).

22           Secondly, while the Supreme Court has confirmed in

23   the light of the notice pleading standard of Rule 8(a) that

24   a Complaint does not need to entail factual allegations to

25   survive a motion under Rule 12(b)(6) -- see Erickson v.

1    Pardus, 127 Supreme Court 2197, 2200 (2007) and Twombly, 550

2    U.S. at 555 -- its "factual allegations must be enough to

3    raise a right to relief above the speculative level."  Id at

4    555.

5            The Complaint must contain sufficient facts

6    accepted as true to stay the claim that is "plausible on its

7    face."  Id at 570.  See also, Ashcroft v. Iqbal, 556 U.S.

8    662, 679 (2009).  "The plausibility standard is not akin to

9    a 'probability requirement,' but it asks for more than sheer

10   possibility that a defendant has acted unlawfully."  Id at

11   678.

12           Evaluating plausibility is a "context-specific

13   task that requires the Court to draw on its judicial

14   experience and common sense, but where the well pleaded

15   facts do not permit the Court to infer more than mere

16   possibility of misconduct.  The Complaint is alleged, but it

17   is not shown, that the pleader is entitled to relief under

18   Rule 8."  Id at 679.

19           In sum then, to determine a motion to dismiss, the

20   Court must first identify the elements of the applicable

21   causes of action.  Id at 675.  Next, it must identify the

22   allegations not entitled to the assumption of truth because

23   they are legal conclusions, not factual allegations.  Id at

24   680.  And finally, it must assess the factual allegations in

25   the context of the elements in the claim to determine

1  whether they plausibly suggest an entitlement to relief or a

2  mere possibility.  Id.

3          Ultimately, the determination is of the legal

4  feasibility of the Complaint's allegations, not the weight

5  of the evidence that might be offered in it support.

6  Halebian v. Berv, 644 F.3d 122, 130 (2d Cir. 2001), and

7  Global Network Communications, Inc. v. City of New York, 458

8  F.3d 150, 155 (2d Cir. 2006).

9          Relatedly, for purposes of this motion, the Court

10  is also guided by Federal Rule of Civil Procedure 9(b)

11  incorporated by Bankruptcy Rule 7009.

12          That rule applies to any instance where a

13  Complaint asserts fraud, which is asserted in this Complaint

14  as to certain causes of action against the movant.  Rule

15  9(b) states, "In alleging fraud or mistake, the party must

16  state with particularity the circumstances constituting

17  fraud or mistake."

18          Generally, the Complaint, therefore, must state

19  what was stated or omitted fraudulently, who it was stated

20  to, and when the statement was made so that the defendant is

21  not left guessing as to the nature of the fraud alleged and

22  forced to speculate as to the circumstances of the alleged

23  fraud.

24          Rule 9(b) goes on to state, "Malice, intent,

25  knowledge, and other conditions of a person's mind may be

1    alleged generally with facts," -- now I'm not quoting from

2    the statute nor to the case law -- with facts from which a

3    Court may infer such a state of mind.

4            Here, the underlying Complaint asserts several

5    causes of action against the movant, Mr. Fareri.  First, it

6    asserts breach of contract under Connecticut law by Mr.

7    Fareri.  Second, it asserts a violation of Connecticut

8    General Statute Section 31-72 as to Mr. Fareri.

9            Third, it asserts a breach of the implied covenant

10   under Connecticut law of good faith and fear dealing.

11   Fourth, it asserts a cause of action for fraud against Mr.

12   Fareri.

13           Each of these causes of action, the motion

14   contents, should be dismissed under Rule 12(b)(6) and as to

15   the fourth cause of action under Rule 9(b).  I will address

16   that cause of action first.

17           The complaint is fundamentally premised upon the

18   alleged breach by Mr. Fareri of a shareholder's agreement, a

19   copy of which is attached to the amended complaint, and also

20   referenced at length in it.  Mr. Fareri signed that

21   agreement twice, first as President of the Gateway

22   Development Group, Inc., and second, along with Mr.

23   Carnicelli as a shareholder.

24           The shareholders agreement lays out the parties'

25   agreements in respect of Gateway Development Group, Inc.

1   Corporation.  It was occasioned, as asserted in the

2   complaint and in the face of the agreement, by the issuance

3   of 98 shares of the corporation, which had been formerly

4   wholly owned by Mr. Fareri to Mr. Carnicelli; 102 shares

5   continuing to be owned by Mr. Fareri, which if one does the

6   math, provides for a 49/51 percent split.

7           Paragraph 4.1 of the shareholders agreement

8   states, "The following named persons shall be elected to the

9   office following their names and shall remain as such during

10  the entire term of this agreement, except as otherwise in

11  this agreement provided."  And it lists Mr. Fareri now as

12  Chairman of the Board and Mr. Carnicelli as the President.

13          It then goes on to state, "Except as otherwise in

14  this agreement provided or required by law, no officer shall

15  be removed with or without cause by any reason whatsoever

16  during the term of this agreement."

17          Paragraph 5.1 states, "The following named persons

18  will be employed in the capacities designated after their

19  names at the annual salaries respectively set forth, with

20  the duties hereinafter provided for each position, and each

21  expressly accepts said employment: A, James Carnicelli, Jr.,

22  Title President, annual salary $250,000.  It then lays out

23  his duties.

24          And then Section 5.2 states, "There shall be no

25  change in any of the aforesaid salaries, nor any of the

1    duties of said employees during the term of said

2    employment."

3           Section 7 of the shareholders agreement lays out

4    the parties' agreements as to allocations and distributions

5    in respect of the corporation.  And there are other

6    provisions in the agreement as well.  But those are the

7    primary ones.  Although I will note, Section 16.5, which

8    states, "The article in section headings in this agreement

9    are inserted for convenience of reference only and shall not

10   affect the construction or interpretation of this

11   agreement."

12          And then finally, 1.8 of the agreement states,

13   "Proper accounting records of all corporation business shall

14   be kept and remain open to inspection or copying by any of

15   the shareholders or their designees or legal representatives

16   at all reasonable times at the end of each calendar year.

17   Complete accounting of the affairs of the corporation shall

18   be furnished to each shareholder, together with such

19   appropriate information as may be required by each

20   shareholder for the purpose of preparing his income tax

21   return for that year.  All matters of accounting for which

22   there is no provision in this agreement are to be governed

23   by generally accepted that supposedly accounting applied on

24   a consistent basis."

25          The complaint alleges that Mr. Carnicelli was

1   improperly terminated as President, and therefore deprived

2   of his ongoing salary, post-termination, notwithstanding the

3   paragraphs in Sections 4 and 5 of the agreement that I have

4   read.  And it therefore alleges that Mr. Fareri caused such

5   improper termination, and independently of the corporation,

6   breached his agreement under the shareholder agreement as a

7   shareholder.

8              That's stated in Paragraphs 35 and 36.  35 states,

9   "Mr. Fareri wrongfully purported to suspend the company's

10  operations and terminate Mr. Carnicelli's role in the

11  company." Paragraph 36 quotes a letter sent by the secretary

12  of the company, apparently, as alleged, Mr. Fareri's

13  daughter.  "I have spoken to [Mr. Fareri] and he asked me to

14  reach out to you.  Given the overall circumstances, acting

15  as the majority shareholder and the sole director of the

16  company, he has decided to suspend operations of the

17  company.  This means that at this point you should not come

18  to the office at 2 Deerfield.  And Mr. Fareri has decided to

19  award the Goshen project West Corp.  Please refrain from

20  going to this site also.  As of the end of workday today,

21  October 18, 2019, you will no longer have access to your

22  Gateway email or work computer."

23             Paragraph 34 of the complaint states that

24  preceding these facts, that is in 2018 and 2019, Mr.

25  Carnicelli demanded that Mr. Fareri are his obligations and

1   pay the company the profits it had earned on the Bronxville

2   project and other projects.  Those allegations, i.e., that

3   Mr. Fareri had caused profits that would otherwise be paid

4   to the company, and therefore ultimately, after payment of

5   creditors, be distributed to the shareholders pro rata, to

6   Mr. Fareri's other companies.  That's stated in Paragraphs

7   31, 32 and 33, and 37 through 40.  The complaint also

8   alleges that that course of that was the result of a

9   fraudulent scheme to divert profits from Mr. Carnicelli.

10          Finally, Paragraphs 45 and 46 state, "Upon

11  information and belief, Mr. Fareri, with the assistance of

12  Mr. Sheskier, another Defendant, manipulated the company's

13  books and records.  Paragraph 46 states, "In July of 2020,

14  Mr. Sheskier informed Mr. Carnicelli that the 2019 company

15  income tax returns were unavailable and that there were no

16  funds available for distributions to shareholders.  He

17  further instructed Mr. Carnicelli that based upon his

18  'internal review' of the financial records, prior year

19  financial records and tax returns would need to be amended.

20  Mr. Sheskier further refused to deliver to Mr. Carnicelli

21  his K-1 schedules and other tax documents and bank

22  information."

23          I will begin with the fourth cause of action,

24  which is, again, a fraud cause of action as to Mr. Fareri,

25  after repeating and reelecting the factual recitations of

1    Paragraphs 1 through 46.

2              Paragraph 68 states, "Mr. Fareri represented to

3    Mr. Carnicelli that he would receive substantial financial

4    benefits from his ownership interest in the company.  Mr.

5    Fareri represented that the company would earn significant

6    profits and that the company would make shareholder

7    distributions after receiving those profits.  These

8    representations were false.  Mr. Fareri never intended to

9    live up to the representations he made.  To the contrary, he

10   intended to maximize his own financial interests at the

11   expense of Mr. Carnicelli's, including by causing entities

12   he controls to withhold monies owed to the company, and by

13   causing the company to refrain from making shareholder

14   distributions.  Mr. Fareri intended for Mr. Carnicelli to

15   rely on his misrepresentations, and Mr. Carnicelli did rely.

16   Accordingly, Mr. Carnicelli has been damaged in an amount to

17   be determined at trial."

18             The motion to dismiss contends that this cause of

19   action fails for not complying with Rule 9(b) of the Federal

20   Rules of Civil Procedure.  In addition, it states that the

21   complaint is untimely, in violation of the applicable

22   Connecticut statute of limitations, which the parties agree

23   as to the only conceivable fraudulent misrepresentation that

24   one could construe from the complaint, namely when the

25   shareholder agreement was entered into, would have run by

1    now.

2            A claim for fraud under Connecticut law is subject

3    to a three-year statute of limitations, as set out in

4    Connecticut General Statute 52-577.  As the Plaintiff

5    acknowledges in his objection, in his memorandum of law

6    objecting to the motion, and if one were to infer from the

7    Paragraph 67 through 71 that I've just noted comprising the

8    fourth cause of action, the cause of action is for the

9    initial entry into the shareholder agreement, which again

10   lays out the intended disbursements of distributions between

11   the parties, without the intent to perform that agreement,

12   that statute would have run by the time of the commencement

13   of the lawsuit.

14           The Court is, frankly, stretching to find even the

15   allegations in Paragraphs 67 through 71 applicable under

16   Rule 9 to the entry into the shareholder agreement, which if

17   they did, would satisfy Rule 9(b), since the nature of the

18   representation is clear and the party making that

19   representation and the party to whom it was made is clear.

20   But the basis for the tolling of the statute would not

21   satisfy Rule 9, which is a continuing course of conduct, or

22   the continuing course of conduct doctrine, where there is an

23   ongoing fraud of ongoing misrepresentations, which are not

24   pled with any specificity, as required by Rule 9(b) in the

25   complaint.

1          The Connecticut courts have been clear that

2     Section 52577 "precludes any construction thereof delaying

3     the start of limitations period until the cause of action

4     has accrued or the injury has occurred."  Fichera v. Mine

5     Hill Corp., 207 Conn. 204, 212 (1988).  See also Crow and

6     Sutton Associates v. C.R. Klewin NE LLC, 2009 Ct. Super

7     LEXIS 777, at 13-14 (March 26, 2009) and the cases cited

8     therein; and Gibbons v. NER Holdings Inc., 983 F.Supp 310

9     (D. Conn. 1997) at 315.

10          So the continuing Course of Conduct Doctrine is

11     not sufficiently pled in the complaint or in the opposition

12     to the motion to defeat the motion as it pertains to the

13     fraud claim.  And that cause of action, therefore, will be

14     dismissed.

15          The first, second and third causes of action all

16     pertain to two different fact patterns stemming from the

17     alleged breach of the shareholder agreement signed by Mr.

18     Fareri, again, in two capacities; first, on behalf of the

19     corporation, and second, in his old capacity as a

20     shareholder.

21          The breach of contract claim alleges a claim for

22     the breach of the right to be the president at an annual

23     salary of $250,000 in perpetuity, and a breach of the

24     provisions of the shareholder agreement providing for

25     distributions and allocations in Section 7, as well as the

1    section pertaining to the keeping of proper accounting

2    records, at least Section 16.8.  Let me address that alleged

3    breach first.

4         Without consideration of any other aspects of the

5    motion, I conclude that that cause of action, or the cause

6    of action based on that alleged breach, should be dismissed,

7    as it does not set forth a possible claim under Twombley and

8    Iqbal against Mr. Fareri.  And in addition, doesn't assert

9    an element of a cause of action for breach of contract,

10   namely that the Plaintiff was damaged by the alleged breach.

11        The complaints in a wholly conclusory fashion that

12   Mr. Fareri cause the accounting records not to be properly

13   kept, when it actually lays out the facts.  They are instead

14   reflective of another Defendant's not keeping the records

15   properly, namely Mr. Sheskier.  But there is no contract

16   between Mr. Carnicelli and Mr. Sheskier, so his claim for

17   failure to maintain financial records is a derivative one in

18   his capacity as a shareholder against the corporation, which

19   may be one that not only warrants damages, but injunctive

20   relief, although the injunctive relief is not requested

21   here, as far as I can tell, specifically with respect to the

22   records.  Let me confirm that.  Well, except in the sense of

23   requesting such other equitable relief as is warranted.

24        The complaint does not even, I believe, assert

25   that there was a demand on Mr. Fareri to cause the financial

1   records to be maintained properly.  So the motion will be

2   granted as to that aspect of the claims set forth in the

3   first, second and third causes of action.

4          As noted, the complaint also contends that Mr.

5   Fareri, in his individual capacity as a shareholder,

6   breached the shareholders agreement and also breached the

7   Implied Covenant of Good Faith and Fair Dealing in that

8   agreement, insofar as the corporation has not lived up to

9   the allocations and distributions provided for in Section 7

10  of the shareholders agreement and instead has diverted

11  corporate opportunities away from the corporation and to

12  other companies owned by Mr. Fareri, and further, has

13  improperly ceased to exist as far as an operating entity is

14  concerned.

15         The motion asserts that these causes of action are

16  not properly viewed as breach of contract or a breach of a

17  duty of good faith and fair dealing causes of action but are

18  rather derivative of the corporation's claims against Mr.

19  Fareri for breach of his fiduciary duties.  And indeed, when

20  he originally brought the lawsuit before the corporation's

21  bankruptcy case, Mr. Carnicelli sued in both his individual

22  and derivative capacities.

23         The Plaintiff responds by saying that there is a

24  separate obligation under the agreement, the shareholders

25  agreement, at least to some extent by Mr. Fareri, because he

1    signed it separately in his capacity as a shareholder, as

2    well as on behalf of the corporation in a separate signature

3    there.  That would constitute, based on the allegations in

4    the complaint, according to Mr. Carnicelli, a basis for

5    independent liability by Mr. Fareri, because he caused the

6    corporation to wrongfully withhold distributions to accede

7    in the diversion of business elsewhere, and to be

8    terminated.

9              Secondly, Mr. Carnicelli alleges that the same

10   conduct constitutes a breach of the Duty of Good Faith and

11   Fair Dealing under Connecticut law, which requires that the

12   Plaintiff and Defendant were parties to a contract under

13   which the Plaintiff reasonably expected to receive certain

14   benefits, that the Defendant engaged in conduct and injured

15   the Plaintiff's right to receive some or all of those

16   benefits.  That when committing the acts by which it injured

17   the Plaintiff's right to receive benefits he reasonably

18   expected to receive under the contract, the Defendant was

19   acting in bad faith.  See Carolina Casualty Ins. Co. v.

20   Connecticut Solid Surface, LLC, 2018 WL 1385193*2 (Conn.

21   Super. Ct. Feb. 16, 2018.)

22             The motion contends that the breach of the

23   shareholder agreement here was a breach as to the conduct of

24   the corporation's business vis-à-vis the shareholders as

25   shareholders, namely their rights to distributions and

1    allocations, and there was no separate agreement, as between

2    the parties other than that, and that therefore, the Court

3    should view this as a derivative claim.

4            I agree with that contention.  I believe that the

5    conduct of the shareholders vis-à-vis each other as

6    shareholders pertains to their fiduciary duties when it goes

7    to the distributions and allocations among them and the

8    conduct of the corporation, and that the claim should

9    therefore be viewed as a derivative claim and not a direct

10   claim against Mr. Carnicelli.

11           The Implied Covenant of Good Faith equally depends

12   upon an independent contract that would not be one that

13   ultimately gives a party derivative rights.  And I conclude

14   that therefore, for the same reason, the causes of action

15   set forth in the first, second and third claims in the

16   complaint, insofar as they relate to a breach of Paragraph 7

17   or Section 7 of the agreement, is one that only the

18   corporation would hold, and it cannot be pursued against Mr.

19   Carnicelli.  And it's a cause of action that is for breach

20   of fiduciary duty and would ultimately result in the same

21   recovery.

22           It is being pursued in this adversary proceeding

23   by the Chapter 7 Trustee, and if in fact there is a

24   recovery, the corporation will have the assets that were

25   allegedly diverted, or the cause of action against Mr.

1    Fareri for damages for that diversion and breach of

2    fiduciary duty, which will flow through the corporation,

3    first to the Debtor's creditors, the corporation's

4    creditors, and then to the shareholders, as per the

5    agreement, subject to any other claim that the corporation

6    would have against either shareholder by way of setoff.  So

7    I will grant the motion as it applies to the improper

8    diversion claims.

9              Lastly, causes of Action 1, 2 and 3, again, assert

10   claims for breach of the shareholder agreement's provisions

11   for Mr. Carnicelli to be President for life and to be paid a

12   salary of $250,000 for life, subject to the other terms of

13   the shareholder agreement.

14             The motion seeks to dismiss those causes of action

15   pertaining to this factual basis for those claims on two

16   grounds.  First, it contends that Sections 5.1 and 2 and 4.1

17   really set up separate obligations that permit Mr.

18   Carnicelli to be dismissed as an employee and the

19   termination of his salary, therefore, notwithstanding

20   Section 4.11.

21             I believe that at a minimum, the shareholder

22   agreement can be read to provide otherwise, and that in all

23   likelihood, Mr. Carnicelli's interpretation of it is correct

24   as to what it provides.  But in any event, the agreement

25   itself sets forth a sufficient basis for Mr. Carnicelli's

1    claim that he would be entitled to $250,000 a year as

2    president under the terms of Paragraph 4.1.  And therefore,

3    that's not a sufficient basis to grant the motion to dismiss

4    this claim.

5              In addition, the motion asserts, again, that this

6    claim is derivative and that the contract itself is with the

7    -- the employment contract, that is, is with the

8    corporation.  It's the corporation that pays Mr.

9    Carnicelli's salary, as president.

10             I believe there is a subtle but important

11   difference, however, between this obligation of the

12   corporation and the general obligation of the corporation to

13   make allocations and distributions, as set forth in Section

14   7.

15             Sections 4.1 and 5.1 and 5.2 detail a separate

16   contract as between the corporation and Mr. Carnicelli

17   that's separate and apart from his rights as a shareholder.

18   Consequently, I believe that Mr. Fareri's agreement as a

19   shareholder to the shareholders agreement and those

20   provisions makes him liable for a breach of those

21   provisions, that is as properly and for purposes of

22   probably, plausibly alleged in the complaint, he caused to

23   happen.  This would be either under the basic breach of

24   contract law of Connecticut, or under the criteria for

25   finding a breach of the Implied Covenant of Good Faith and

1   Fair Dealing.

2           The reply to Mr. Carnicelli's objection to the

3   motion alleges that complaint does not set forth a

4   sufficient basis for bad faith in the complaint on this

5   point, for purposes of cause of action, for breath of the

6   Covenant of Good Faith and Fair Dealing, but I believe that

7   the allegations that I've gone through on the record do in

8   fact set forth a sufficient possible basis under Twombly and

9   Iqbal for each of the elements of the breath of the Duty of

10  Good Faith and Fair Dealing, in that one can reasonably

11  infer from the facts alleged in the complaint, which of

12  course I have to take as true for purposes of this motion,

13  that Mr. Fareri caused the termination of Mr. Carnicelli on

14  a pretextual basis to disable him from continuing to assert

15  his rights as a shareholder, and to deprive him of his

16  ongoing salary and access to the corporation as president,

17  which I believe is a sufficient basis under Connecticut's

18  case law for purposes of the Implied Covenant of Good Faith

19  Fair Dealing.

20          I also conclude that notwithstanding what may

21  reasonably be viewed as the plain meaning of Connecticut

22  General Statute, Section 31-71(a)(3) and 72, that a cause of

23  action by an employee for wages only covers wages for

24  services previously rendered.  That cause of action could,

25  and specifically could under the facts alleged in the

1   complaint, cover at least to some extent future wages where

2   an employee was terminated wrongfully to prevent that

3   employee from performing and therefore recovering the wages

4   that he would have earned under a contract.

5              So, in essence, I believe that courts in

6   Connecticut applying Connecticut law have extended Sections

7   31-71(a) and 72 to cover a situation that is closely

8   analogous, if not on all fours, with the Implied Covenant of

9   Good Faith and Fair Dealing here, namely that a claim for

10  future wages is sufficiently pled, based upon the pretextual

11  nature of the termination in bad faith to prevent Mr.

12  Carnicelli from continuing to earn his $250,000 under the

13  agreement.  See Harty v. Cantor Fitzgerald & Co., 275 Conn.

14  72, 102-105 (2015); Butler v. Cadbury Beverages, Inc., 1999

15  U.S. Dist. LEXIS 16098 (D. Conn. June 20, 1999); and Pereira

16  v. DSL Net, 2000 Ct. Sup. LEXIS 2050 *11-12 (July 28, 2000).

17             So I will deny the motion as to the first three

18  causes of action, as they pertain to the frustration of Mr.

19  Carnicelli's right to receive his annual employment contract

20  of $250,000 a year.

21             Where I have granted the motion, it is not with

22  prejudice.  My practice is to permit at least one motion to

23  amend.  I think that's appropriate here, especially

24  appropriate here, rather, given that this complaint was

25  filed pre-bankruptcy in the Connecticut State Court, and I

1    think the Plaintiff may not have cared as much, as to the

2    differentiation between derivative and non-derivative

3    claims, as is now necessary, given that the corporation is

4    in bankruptcy.

5            I have noted on the record that conceivably the

6    complaint might set forth a cause of action for tortious

7    interference under Connecticut law, but it's not so clear to

8    me that I would deny the motion to dismiss on that basis.

9

10            (Whereupon these proceedings were concluded at

11    1:26 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3         I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  February 16, 2022