DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for James J. Carnicelli Jr.*
605 Third Avenue
New York, New York 10158
(212) 557-7200
Robert L. Rattet, Esq.
James B. Glucksman, Esq

<div style="float:right">

*Hearing Date: October 6, 2022*
*Objection Deadline: September 30, 2022*

</div>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------- x
In re:                                            :   Case No. 21-22304-(SHL)
                                                  :
THE GATEWAY DEVELOPMENT GROUP,                    :
INC.,                                             :
                                                  :
Debtor.                                           :
------------------------------------------------- x
HOWARD MAGALIFF, TRUSTEE, and                     :   Adv. Proc. No. 21-07093 (SHL)
JAMES CARNICELLI, JR.,                            :
                                                  :
Plaintiffs,                                       :
                                                  :
-against-                                         :
                                                  :
JOHN J. FARERI, JULIE FARERI, and                 :
CHRISTOPHER SHESKIER,                             :
                                                  :
Defendants.                                       :
------------------------------------------------- X
JOHN J. FARERI,                                   :
Counterclaim-Plaintiff,                           :

v.
                                                  :
JAMES CARNICELLI, JR.

Counterclaim Defendant.
------------------------------------------------- X
```

**JOINT MOTION TO REMAND PROCEEDING TO THE JUDICIAL
DISTRICT OF STATE OF CONNECTICUT, SUPERIOR COURT OF
STAMFORD/NORWALK OR, IN THE ALTERNATIVE, FOR
<u>MANDATORY OR PERMISSIVE ABSTENTION</u>**

Plaintiffs James Carnicelli, Jr. ("Mr. Carnicelli") and Howard Magaliff a/t/o The Gateway Development Group, Inc. (the "Trustee") (Mr. Carnicelli and the Trustee jointly the "Plaintiffs") respectfully submit this motion pursuant to 28 U.S.C. § 1452(b) to remand the claims asserted against John J. Fareri ("Mr. Fareri"), Julie Fareri, and Christopher Sheskier (the "Defendants"), together with Mr. Fareri's counterclaim against Mr. Carnicelli (Plaintiffs' claims and Mr. Fareri's counterclaim collectively the "Claims") in the above-captioned adversary proceeding (the "Adversary Proceeding") back to the State of Connecticut Superior Court of Stamford/Norwalk (the "State Court"), where the state action was originally commenced and assigned Docket No. FST-CV20-6048778-S (the "Connecticut State Court Action"), or in the alternative, for mandatory and/or discretionary abstention, and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      This Court should exercise its discretion to equitably remand the Claims to the State Court because they are non-core claims involving state law issues and not bankruptcy law issues and because, despite Defendants' non-objection to the Trustee's removal of the Connecticut State Court Action to the Connecticut District Court and then its transfer to this Court, which was effectuated on August 27, 2021 (ECF No. 1, Part 1, *see* ECF No. 25), it was not until July 11, 2022 that Defendants first revealed "that they do not consent to entry of final orders or judgment by the Bankruptcy Court" (ECF No. 36)[1].

2.      The Claims arise exclusively under Connecticut state law. They require the application of multiple Connecticut statutes and common law doctrines, and given Defendants'

---

[1] Defendants first made this revelation in a pleading entitled, "Statement Pursuant to Rule 9027(e)(3)" (the "Rule 9027(e)(3) Statement"). Fed. R. Bankr. P. 9027(e)(3), however, requires such a statement to be filed "not later than 14 days after the filing of the notice of removal." The Trustee's Notice of Removal of the Connecticut State Court Action to the United States District Court for the District of Connecticut was filed on June 10, 2021 (*Carnicelli v. Fareri et al.*, Civ. Action No. 3:21-cv-00792-RNC (D. Conn.) (ECF No. 1), thus making Defendants' Rule 9027(e)(3) Statement over one year late.

recently disclosed refusal to consent to final orders or judgments of this Court, under principles of comity and federalism, the Claims should be decided by a Connecticut state court. Those principles of comity and federalism are particularly applicable here. The State Court is already familiar with the Claims from multiple pretrial proceedings held in the State Court. As to be more sufficiently explained below, the Claims satisfy at least six (6) of the twelve factors Courts in this jurisdiction analyze when deciding a motion to abstain.

3.     By their Rule 9027(e)(3) Statement, Defendants have expressly declined to consent to entry of final orders or judgments by the Bankruptcy Court and thus, it would appear that all parties in the Adversary Proceeding do not wish to litigate these issues further in the Bankruptcy Court. In addition, litigation here would require a two-tiered, duplicative proceeding, *see* 28 U.S.C. § 157(c)(1), with a corresponding delay in final resolution and inefficient use of judicial resources. Principles of judicial efficiency therefore require remand to the State Court.

4.     Accordingly, both Plaintiffs, Mr. Carnicelli and the Trustee, seek an order remanding these Claims to the State Court.

## PROCEDURAL HISTORY

5.     Mr. Carnicelli is the 49% shareholder of the Debtor, which is a construction management services company that managed projects for numerous real estate companies owned and controlled by Mr. Fareri. Mr. Fareri owns the remaining 51% shares of the Debtor.

6.     On October 9, 2020, Mr. Carnicelli commenced the Connecticut State Court Action as a direct and derivative plaintiff against the Defendants. The complaint commencing the Connecticut State Court Action alleged direct claims brought on Mr. Carnicelli's own behalf as well as derivative claims brought on behalf of the Debtor.

7.     The direct causes of action asserted in the Connecticut State Court Action included breach of contract against Mr. Fareri and the Debtor, violation of C.G.S §31-72 against Mr. Fareri

3

and the Debtor for failure to pay wages, breach of the covenant of good faith and fair dealing against Mr. Fareri and the Debtor, and fraud against Mr. Fareri. The derivative claims included breach of fiduciary duty against the Defendants, aiding and abetting breach of fiduciary duty against Julie Fareri and Christopher Sheskier, statutory theft of corporate assets under C.G.S. §52-564 against Mr. Fareri, conversion of corporate assets against Mr. Fareri, and claims under the Connecticut Unfair Trade Practices Act ("CUTPA") based on diversion of corporate assets and opportunities and other corporate wrongdoing against the Defendants. All of the claims arose exclusively under Connecticut state law.

8.     The derivative claims were all essentially based on allegations that Mr. Fareri, with the assistance of Julie Fareri and Christopher Sheskier, diverted profits and opportunities of the Debtor to related companies controlled and/or owned by Mr. Fareri by underpaying the Debtor for services it performed for those companies, improperly terminated the Debtor's operations and transferred its workforce and assets to the other Fareri-owned companies, and improperly altered or misstated the Debtor's financial records in such a way as to hide the corporate misappropriation. The breach of contract and unpaid wage claims were principally based on the Debtor's failure to pay Mr. Carnicelli his contractual salary, Mr. Fareri's misstating the corporate books and records and his firing of Mr. Carnicelli as President. The breach of the implied covenant of good faith claim relates to a shareholder agreement to which Mr. Fareri, Mr. Carnicelli and the Debtor are parties, and alleged that the implied covenant was breached by the failure to operate the Debtor in the best interests of the company, its shareholders and creditors. The fraud claim against Mr. Fareri was based on alleged false representations by Mr. Fareri to Mr. Carnicelli that the latter would earn significant profits as a shareholder, when Mr. Fareri knew he would be diverting those profits

4

or eliminating them by causing other companies he owned to underpay the Debtor on various projects.

9. Following the filing of the Connecticut State Court Action, the case was referred to the Connecticut Judicial Branch's Complex Litigation Docket, which is used in Connecticut for the most challenging civil cases. Cases assigned to the Complex Litigation Docket often involve novel or difficult legal issues or claims for very significant amounts of damages. Specific case management procedures are in place to promote the efficient resolution of these complex cases.

10. The Defendants responded to the complaint in the Connecticut State Court Action by filing a motion to dismiss all the derivative claims on the ground that Mr. Carnicelli was not a proper plaintiff. The State Court denied that motion in a written opinion dated March 5, 2021. The Defendants then moved to compel arbitration, a motion the State Court denied by written opinion dated March 19, 2021. The Defendants then filed a Request to Revise the complaint, which the State Court granted in part and denied in part.

11. In the meantime, a panel of three arbitrators issued an award (the "Award") in a related arbitration brought derivatively by Mr. Carnicelli on behalf of the Debtor against one of Mr. Fareri's companies, Gateway Kensington LLC ("Kensington"). The arbitrators awarded the Debtor and Mr. Carnicelli more than $14 million, finding that Kensington, controlled by Mr. Fareri, had substantially underpaid the Debtor for work it performed. The Award of Arbitrators is attached hereto as **Exhibit A**.

12. Mr. Carnicelli then filed an application for a preliminary injunction in the Connecticut State Court Action to secure the funds to pay the Award. The State Court scheduled a hearing on the application for May 26, 2021.

13.     In addition, on March 31, 2021, the parties jointly submitted an extensively negotiated Joint Case Management Schedule, which included dates for completion of discovery, briefing of dispositive motions, and other pretrial proceedings. (Connecticut State Court Action, Docket No. 127.00) On April 7, 2021, the State Court approved the joint proposed schedule and entered a scheduling order setting a jury trial for March 14, 2023. (Connecticut State Court Action, Docket No. 127.01). The aforementioned Joint Case Management Schedule and corresponding Order are attached hereto as **Exhibit B**.

14.     On May 25, 2021, Mr. Fareri, as sole director and majority shareholder of the Debtor, caused the Debtor to file its Chapter 7 petition, commencing the underlying bankruptcy proceeding and staying the Connecticut State Court Action, including discovery and the preliminary injunction hearing.

15.     The Trustee was appointed shortly thereafter and, on June 10, 2021, the Trustee removed the Connecticut State Court Action to the United States District Court, District of Connecticut (the "Connecticut District Court Removed Proceeding"). On June 14, 2021, the Trustee moved to transfer the Connecticut District Court Removed Proceeding to this Court.

16.     On June 16, 2021, Mr. Carnicelli filed a Motion to Remand the Connecticut District Court Removed Proceeding to the Connecticut Court (the "Motion to Remand," Connecticut District Court ECF Docket No. 13) and an Objection to Motion to Transfer the Connecticut District Court Removed Proceeding to this Court (the "Objection to Transfer", Connecticut District Court ECF Docket No. 14). On July 16, 2021, Mr. Carnicelli withdrew the Motion to Remand (Connecticut District Court ECF Docket No. 18) and the Objection to Transfer (Connecticut District Court ECF Docket No. 19), and on August 2, 2021, the Connecticut District Court granted the Motion to Transfer (Connecticut District Court ECF Docket No. 24).

17.     On August 27, 2021, the Connecticut District Court transferred this proceeding to this Court. On December 7, 2021, Mr. Carnicelli and the Trustee jointly filed an Amended Complaint (the "Amended Complaint", ECF Docket No. 10), and on December 13, 2021, Mr. Fareri filed a Motion to Dismiss the Amended Complaint (the "Motion to Dismiss", ECF Docket No. 11). On January 27, 2022 this Court entered an order granting in part and denying in part the Motion to Dismiss and allowing Mr. Carnicelli to seek leave to file a Second Amended Complaint (ECF Docket No. 16).

18.     Accordingly, on February 28, 2022, Mr. Carnicelli filed a Motion for leave to file a Second Amended Complaint (ECF Docket No. 18), and on March 21, 2022, this Court entered an order granting in part leave for Mr. Carnicelli to file a Second Amended Complaint (ECF Docket No. 23), which was then filed on March 22, 2022 (ECF Docket No. 24).

19.     On April 12, 2022, Mr. Fareri filed a counterclaim against Mr. Carnicelli for common law indemnification under Connecticut law. On May 9, 2022, Mr. Carnicelli filed a motion to dismiss the counterclaim on the ground that it does not state a claim upon which relief may be granted under Connecticut law. Although an opposition was filed, a Reply has not been filed. That motion remains pending.

20.     While the Adversary Proceeding did not progress beyond the pleading stage, the parties were of the belief that a settlement of all Claims was possible and therefore agreed to a mediation before Judge Drain, which took place on June 6, 2022 (ECF No. 31). The mediation took place as scheduled, but it was not successful.

21.     On July 11, 2022, over one year after they were required by Fed. R. Bankr. P. 9027(e)(3) to do so, the Defendants filed their Rule 9027(e)(3) Statement stating that "they do not consent to entry of final orders or judgment by the Bankruptcy Court." (ECF Docket No. 36).

Defendants' Rule 9027(e)(3) Statement constitutes an express representation that they do not consent to the adjudication of these Claims in Bankruptcy Court. It is apparent from the above-presented procedural history and the Rule 9027(e)(3) Statement that no party wishes to litigate the Adversary Proceeding in this Court.

## ARGUMENT

22.     "On a motion for remand, the court must construe all disputed questions of fact and controlling substantive law in favor of the plaintiff. Moreover, removal jurisdiction must be strictly construed, both because the federal courts are courts of limited jurisdiction and because removal of a case implicates significant federalism concerns." *Sealink Funding Ltd. v. Bear Sterns & Co.*, 2012 WL 4794450, at *2 (S.D.N.Y. Oct. 9, 2012) (internal quotation omitted); *see also Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 220 (2d Cir. 2013) (Supreme Court has directed federal courts "to construe removal statutes strictly and resolve doubts in favor of remand") (citations omitted); *see also Allstate Ins. Co. v. Credit Suisse Secs.*, 2011 WL 4965150, at *4 (S.D.N.Y. Oct. 19, 2011) ("To the extent we have any doubts about removability, they must be resolved in plaintiff's favor."

### A.     THIS COURT SHOULD EXERCISE ITS DISCRETION TO REMAND UNDER 28 U.S.C. §§ 1334(c)(1) AND 1452(b)

23.     28 U.S.C. §1452 provides as follows:

(a) A party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.

(b) The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground. An order entered under this subsection remanding a claim or cause of action, or a decision to not remand, is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title.

24. The remand provided for in 28 U.S.C. §1452(b) is discretionary and may be based upon "any equitable ground."

25. The factors used by courts for purposes of deciding whether permissive abstention or equitable remand is appropriate are essentially the same. In particular, "[w]hen deciding whether to equitably remand under section 1452(b), courts consider factors substantially similar to those considered under the section 1334(c)(1) analysis." *George Washington Bridge Bus Station and Infrastructure Development Fund v. Port Authority of New York and New Jersey (In re George Washington Bridge Bus Station Development Venture LLC)*, 2022 WL 1714176, at *6 (Bankr. S.D.N.Y. May 25, 2022). *See also Hart v. Bello*, 2011 WL 1584577, at *12-13 (S.D.N.Y. Apr. 27, 2011) ( "courts have considered one or more (not necessarily all) of twelve factors") (citations omitted). The twelve factors routinely cited by courts are:

> (1) the effect or lack thereof on the efficient administration of the estate if a court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than the form of an asserted 'core' proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the court's] docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties.

*See Bello.* at *13-14 n.5; *see also In re Am. Equities Grp., Inc.*, 460 B.R. 123, 130 (Bankr. S.D.N.Y. 2011) ("This unsettled question of law, as well as the competing policy considerations underlying the same, therefore weigh in favor of remand to the State Court, which, "by greater knowledge of what [it wants] to accomplish, and a greater interest in regulating the area in question," provides "the best forum for determining issues of this nature"); *In re Lyondell Chemical Co.*, 402 B.R. 596, 614 (Bankr. S.D.N.Y.2009) (…'Comity focuses on the state's interest in developing its law and

applying its law to its citizens.' (internal quotations omitted). Here, as discussed above, New York has a strong interest in developing unsettled Article 9 law in accordance with its policy considerations. These comity concerns are buttressed by the parties' strong connection to New York"). *See also Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.,* 130 B.R. 405, 408 (S.D.N.Y. 1991) ("This "is a state law action and a state court is 'better able to respond' to a suit involving state law").

26.     Here, the relevant factors weigh overwhelmingly in favor of remand. The most significant factors are the following:

27.     First, the Claims arise exclusively under state law and are noncore but related to the Debtor's underlying bankruptcy proceeding. In particular, claims of the type asserted by the Trustee here for breach of fiduciary duty and the other claims asserted derivatively by Mr. Carnicelli in the Connecticut State Court Action have been held to be non-core claims that fall within a bankruptcy court's "related to" jurisdiction. *See O'Connor v. DL-DW Holdings, L.L.C. (In re Extended Stay, Inc.),* 2020 WL 10762310, at *4 (Bankr. S.D.N.Y. Aug. 8, 2020) (finding that "claims of illegal distributions to equity holders, conversion, waste, unjust enrichment and breach of fiduciary duties (including conspiracy and aiding and abetting) under applicable state law," although falling "outside the Court's core jurisdiction, ... fit squarely within the Court's "related to" jurisdiction") (citing *ResCap Liquidating Tr. v. Primary Capital Advisors, LLC (In re Residential Capital, LLC),* 527 B.R. 865, 871 (Bankr. S.D.N.Y. 2014) and *Harrison, Jr. v. Rabinovici (In re Jesup & Lamont, Inc.),* 2012 WL 3822135, at *4 (Bankr. S.D.N.Y. Sept. 4, 2012)). *See also Official Committee of Unsecured Creditors of Allied Systems Holding, Inc. and Its Affiliates v. Yucaipa American Alliance Fund I, L.P. (In re Allied Systems Holdings, Inc.),* 425 B.R. 598, 606 (Bankr. D. Del. 2015) (claims against CEO and board member of debtor "for breach

of fiduciary duty and aiding and abetting breach of fiduciary duty constitute non-core, related-to proceedings over which the Court may submit proposed findings of fact and conclusions of law"); *McCord v. Papantoniou*, 316 B.R. 113, 121 (Bankr. E.D.N.Y. 2004) (breach of fiduciary duty claims arising prepetition held to be noncore but related); *In re 610 W. 142 Owners Corp.*, 219 B.R. 363, 370-71 (Bankr. S.D.N.Y. 1998) (same).

28.     Under 28 U.S.C. § 157(c)(1), in a noncore but related to proceeding "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."    Remanding a removed proceeding that would be subject to this two-tiered process has been found to provide "a more direct route for the parties to obtain a final adjudication on the merits," and as a result, militates in favor of remand. *New York Commercial Bank v. Pullo*, 2013 WL 494050, at *6 (Bankr. S.D.N.Y. Feb. 7, 2013). *See also White Oak Corp. v. American International Group, Inc. (In re National Eastern Corp.)*, 391 B.R. 663, 670 (Bankr. D. Conn. 2008) (citing inability of bankruptcy court to enter final judgment on noncore claims as supporting remand).

29.     Comity also favors allowing state courts to decide issues of state law. *See, e.g. Smith v. Weinstein*, 578 F. Supp. 1297, 1306 (S.D.N.Y.), aff'd, 738 F.2d 419 (2d Cir. 1984) ("[p]laintiff should seek decisions on the new issues he raises from the [state] courts, which have a substantial interest in ruling on them, and which will be able to render more "sure-footed" readings in these relatively 'uncharted areas of state law.'"); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of

applicable law."); *Pride v. Cmty. Sch. Bd. of Brooklyn, New York Sch. Dist. No. 18*, 482 F.2d 257, 271 (2d Cir. 1973) ("As the Court in *Gibbs* made clear, however, that does not end the inquiry, for the constitutional jurisdiction over the state claim–the "power"–"need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."). *In re Viper Prod. & Servs.*, LLC, 2022 WL 2707879, at *2 (Bankr. N.D. Tex. July 11, 2022) ("all claims in this action are based exclusively on state law. The predominance of state-law issues, coupled with comity considerations, favors abstention or remand to state court").

30. Now that the Plaintiffs know that Defendants are not consenting to the entry of final judgments by this Court, there is no need for a federal court to decide the extent of the Defendants' fiduciary duties, their obligations under CUPTA, or the availability of indemnification under Connecticut common law.

31. This case was already assigned to the Complex Litigation Docket, indicating it is a case in which the State of Connecticut has a particularly strong interest. In addition, the State Court is already familiar with the Claims, having administered the case for eight months prior to removal, including ruling on multiple motions.

32. Second, there is no basis for jurisdiction other than 28 U.S.C. § 1334(b). See *James Carnicelli, Jr. v. John J. Fareri, et al.*, Case No. 21-792 (D. Conn) (ECF Dkt. No. 1.) (Notice of Removal). While the bankruptcy court may have the ability to exercise jurisdiction, then, the question is whether it should do so. Where issues of state law governing breach of fiduciary and fraud claims would benefit from the expertise of a state court, remand is appropriate *See 9281 Shore Road Owners Corp. v. Seminole Realty Co. (In re 9281 Shore Road Owners Corp.)*, 214 B.R. 676, 696 (Bankr. E.D.N.Y. 1997).

33.     Perhaps most significantly, and as previously detailed, Defendants' Rule 9027(e)(3) Statement, combined with the prevailing case law, renders this Court unable to render final judgments in this case. *See In re Bearing Point, Inc.,* 453 B.R. 486, 488 (Bankr. S.D.N.Y. 2011).

34.     By virtue of the foregoing, this Court should remand this Adversary Proceeding to the State Court.

## B.     THE COURT SHOULD ABSTAIN

35.     As will be discussed below, the claims neither arise under nor in a Title 11 case, and thus are subject to mandatory abstention and should be remanded. Alternatively, the Court should exercise its discretion to abstain.

### i.     The Claims Do Not "Arise Under" Title 11

36.     A case "arises under" title 11 if it "invoke[s] substantive rights *created* by bankruptcy law. *In re Housecraft Indus. USA, Inc.*, 310 F.3d 64, 70 (2d Cir. 2002) (emphasis added). "[A] state law claim by one non-debtor against another that derives solely from New York law does not arise under the Bankruptcy Code." *In re Extended Stay Inc.*, 418 B.R. 49, 60 (Bankr. S.D.N.Y. 2009) aff'd in part, 435 B.R. 139 (S.D.N.Y. 2010). Mr. Carnicelli commenced an action in the Connecticut State Court for inter alia, breaches of fiduciary duty and conversion, governed by Connecticut law. These causes of action were created under Connecticut law, not the Bankruptcy Code. Accordingly, "'[a]rising under' jurisdiction plainly does not exist in this case: none of [P]laintiff's causes of action are asserted under a provision of the Bankruptcy Code." *Lothian Cassidy, LLC v. Lothian Exploration & Dev. II, L.P.*, 487 B.R. 158, 162 (S.D.N.Y. 2013), *reconsideration denied* (Feb. 21, 2013), *appeal dismissed* (Apr. 11, 2013), *reconsideration denied*, 2015 WL 756667 (S.D.N.Y. Feb. 20, 2015).

37.     The test for "arising under" jurisdiction is not whether it "concerns" a right created by title 11, but whether it "invokes" such a right. *See In re Adelphia Commc'ns Corp.*, 307 B.R. 404, 413 (Bankr. S.D.N.Y. 2004) ("[a]rising under jurisdiction relates to ... those federal questions that have their origin in title 11 ... and where relief sought is based upon a right created by title 11"); *In re Daley*, 224 B.R. 307, 311 (Bankr. S.D.N.Y. 1998) ("Arising under" jurisdiction covers any cause of action created by title 11").

38.     The rights invoked here are those that are created by state law – not any sort of rights which have their origin under the Bankruptcy Code.

**ii.     The Claims Do Not "Arise in" a Proceeding Under Title 11**

39.     Generally speaking, U.S. District Courts have "arising in" jurisdiction over actions that are "not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of bankruptcy." *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010) (internal quotation omitted). Such jurisdiction turns on whether the action in question involves "claims that, ***by their nature, not their particular factual circumstance***, could ***only*** arise in the context of a bankruptcy case." *Stoe v. Flaherty*, 436 F.3d 209 (3d Cir. 2006), *as amended* (Mar. 17, 2006) (emphasis added). For example, actions involving malpractice claims against estate professionals appointed and supervised by a bankruptcy court "arise in" a bankruptcy case because they "would have no practical existence *but for* the bankruptcy." *Baker*, 613 F.3d at 351 (emphasis in original) (citation omitted). On the other hand, "a dispute arising from a pre-petition contract will usually not be rendered core simply because the cause of action could only arise post-petition.[2] *See also*

---

[2] *In re U.S. Lines, Inc.*, 197 F.3d at 638 (2d Cir. 1999); see also id. at 637-38 ("In *Orion*, for example, we held to be non-core *Orion*'s cause of action for anticipatory breach of a pre-petition contract ... even though the event that triggered *Orion*'s claim occurred post-petition." (citing *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1097- 1102 (2d Cir. 1993)); *In re Enron Power Mktg., Inc.*, 2003 WL 68036, at *9 (S.D.N.Y. Jan. 8, 2003) ("[C]auses of action [that] are essentially contract claims dressed up as bankruptcy claims ... must be considered 'non-core' ....").

*Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 160–61 (2d Cir. 2017) ("Rather, the defendants argue that the plaintiffs' claims "are rooted in, and would have no existence but for, the Debtor's bankruptcy case." ....We need not resolve, however, whether an adversary proceeding was the only way in which the plaintiffs could have litigated the claims in their present lawsuit. It is enough to hold here that the circumstances did not demand that plaintiffs raise their claims in the bankruptcy proceeding, and to note that the relevant issues were not litigated through an adversary proceeding or otherwise.").

40.     Although the Trustee is a Plaintiff asserting Claims that, if successful, would augment the estate, the Claims are not automatically rendered core, or uniquely subject to the bankruptcy court's core jurisdiction. Indeed, the prevailing case law holds that such Claims are noncore, but related. *See supra.* ¶27.

### a. The Claims Are Neither Unique To, Nor Uniquely Affected By Title 11 Cases

41.     The Claims seek to resolve governed by Connecticut law. The Claims are state law claims against non-debtors that seek damages on behalf of the Plaintiffs, and a counterclaim by a non-debtor against a non-debtor for indemnification under Connecticut common law. Disputes of this nature can and do arise outside the context of any bankruptcy proceeding.[3] Thus, by its nature, the Claims are not "unique" to bankruptcy. *See, e.g., In re Nw. Airlines Corp.*, 384 B.R. 51, 57 (S.D.N.Y. 2008).

---

[3] *See, e.g., NFC Collections LLC v. Helsing Releasing, LLC*, No. 2:13-cv-07264-R-PJW, 2014 WL 5419462 (C.D. Cal. Oct. 23, 2014) (dispute between parties to intercreditor agreement over right to payment of collateral covered by that agreement); *ZBD Constructors, Inc. v. Billings Generation, Inc.*, 2011 WL 1327144 (S.D.N.Y. Mar. 25, 2011) (case requiring construction of terms of intercreditor agreement over entitlement of funds brought without any bankruptcy proceeding pending); *Highland Park CDO I Grantor Trust, Series A v. Wells Fargo Bank, N.A.*, 2009 WL 1834596 (S.D.N.Y. June 16, 2009) (same).

## b. The Claims Do Not Directly Affect A Core Bankruptcy Function In The Chapter 7 Case

42.     The Claims will not affect a "core" bankruptcy function in the Chapter 7 Case, directly or otherwise.

43.     The fact that an action's goal is to augment the estate as opposed to restructuring debtor-creditor rights does not make it a core proceeding. The action is one to vindicate a "private right" and does not, by itself, create bankruptcy court jurisdiction to enter final orders and judgments. The Supreme Court, in *Stern v. Marshall*, 564 U.S. 462, 492 (2011) explained:

> The most recent case in which we considered application of the public rights exception—and the only case in which we have considered that doctrine in the bankruptcy context since *Northern Pipeline*—is *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). In *Granfinanciera* we rejected a bankruptcy trustee's argument that a fraudulent conveyance action filed on behalf of a bankruptcy estate against a noncreditor in a bankruptcy proceeding fell within the "public rights" exception. We explained that, "[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court." *Id.,* at 54–55, 109 S.Ct. 2782. We reasoned that fraudulent conveyance suits were "quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Id.,* at 56, 109 S.Ct. 2782. As a consequence, we concluded that fraudulent conveyance actions were "more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions." *Id.,* at 55, 109 S.Ct. 2782.[7] (FN Text) We noted that we did not mean to "suggest that the restructuring of debtor-creditor relations is in fact a public right." 492 U.S., at 56, n. 11, 109 S.Ct. 2782. Our conclusion was that, "even if one accepts this thesis," Congress could not constitutionally assign resolution of the fraudulent conveyance action to a non-Article III court. *Ibid.* Because neither party asks us to reconsider the public rights framework for bankruptcy, we follow the same approach here.

*Stern v. Marshall*, 564 U.S. 462, 492, (2011). *See also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56, (1989) ("But the plurality also emphasized that state-law causes of action for breach of contract or warranty are paradigmatic private rights, even when asserted by an insolvent corporation in the midst of Chapter 11 reorganization proceedings."). Surely complex

Connecticut law issues such as the fiduciary duties of majority and controlling shareholders must be seen as a private right.

44.     The Court, in *In re Lyondell Chem. Co.*, 467 B.R. 712, 722 (S.D.N.Y. 2012), explained that "a court should not lightly infer from a litigant's conduct consent to have private state-created rights adjudicated by a non-Article III bankruptcy judge" stating: "Under Fed. R. Bankr.P. 7012(b), which requires "express consent of the parties" for a bankruptcy court to enter final orders and judgments in non-core matters, mere implied consent appears to be insufficient. Fed R. Bankr.P. 7012(b)." In this case, the Defendants have filed the Rule 9027(e)(3) Statement asserting that they do not consent to the entry of final orders and judgments. Thus, the matter is ripe for remand.

45.     In a very recent decision, *In re Viper Prod. & Servs., LLC,* the court remanded claims brought by a debtor under state law to recover amounts owed for goods and services. The court held that none of the claims, which were brought prior to the bankruptcy, were core matters. *In re Viper Prod. & Servs., LLC,* No. 21-50187-RLJ11V, 2022 WL 2707879, at *3 (Bankr. N.D. Tex. July 11, 2022). While the court noted that the claims were core in form, "the substance of the claims is non-core—all claims arise under state common law." *Id.* at *4.

46.     Furthermore, the court noted that while the debtor's successful prosecution of its claims would affect the estate by bringing in funds, that factor was not compelling because the debtor was not going forward under a reorganization plan. *Id.*

47.     The *Viper* court explained:

When the motion for abstention and/or remand was heard, Viper intended to seek confirmation of a chapter 11 plan of reorganization. Since then, however, Viper has informed the Court on the record that it intends to seek either confirmation of a chapter 11 liquidation plan or conversion to chapter 7. The effect that this action may have on the administration of the bankruptcy estate is thus minimized. While a successful prosecution of the action by Viper may result in significantly more

funds available to creditors, it will not assist Viper's reorganization efforts, as Viper initially asserted. The Court affords this factor little weight."

*Id.* at *4 (citation to the *Viper* docket omitted).*Viper, Id., at* *4.

48.     As in *In re Viper,* a successful prosecution of the Connecticut State Court Action here will not have any effect on the administration of the estate; it will only impact the amount of funds payable to creditors and equity holders. Conversely, remand of the Claims will have a favorable effect on the administration of the estate in that remand will allow the Claims to be adjudicated expeditiously in the State Court without the risk of repetitive litigation in both this Court and the district court.

### iii.     The Claims Meet The Requirements For Mandatory Abstention Under 28 U.S.C. § 1334(c)(2)

49.     "28 U.S.C. § 1334(c)(2) provides for mandatory abstention in non-core cases—that is, those involving state-law claims for which the sole basis of bankruptcy jurisdiction is 'related to' jurisdiction." *Celotex Corp. v. Edwards,* 514 U.S. 300, 323 n.10, 115 S. Ct. 1493, 131 L. Ed. 2d 403 (1995); *see also Stern v. Marshall,* 131 S. Ct. 2594, 2620, 180 L. Ed. 2d 475 (2011) ("Section 1334(c)(2), for example, requires that bankruptcy courts abstain from hearing specified non-core, state law claims that 'can be timely adjudicated[ ] in a State forum of appropriate jurisdiction.'")

50.     If the Court determines, as it should, to abstain under 28 U.S.C. § 1334(c)(2), it must remand the case to the State Court. *See Mt. McKinley Ins. Co. v. Corning Inc.,* 399 F.3d at 446-47 (holding that abstention applies to removed actions and, if appropriate, requires that case be remanded). Section 1334(c)(2) provides as follows:

[u]pon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this

section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

51.     A removed state court action must satisfy six criteria to meet the requirements for mandatory abstention: (1) a "timely" motion for abstention must have been brought; (2) the action must be based upon a state law claim; (3) the action must be "related to" a bankruptcy proceeding, as opposed to "arising under" the Bankruptcy Code or "arising in" a case under the Bankruptcy Code; (4) the sole federal jurisdictional basis for the action must be Section 1334; (5) the sole jurisdictional basis for the action must be an action "commenced" in state court; and 6) the action must be capable of being "timely adjudicated" in state court. *See Covanta Onondaga Ltd. v. Onondaga Cnty. Res. Recovery Agency*, 281 B.R. 809, 816 (N.D.N.Y. 2002). Because of the need to give due regard to the independent authority of state courts, federal courts should construe these factors narrowly, in favor of remand rather than removal. See *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 220 (2d Cir. 2013) (directing federal courts "to construe removal statutes strictly and resolve doubts in favor of remand"); *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 201 (2d Cir. 2001) (holding that removal statutes are to be strictly construed).

52.     Here, the Claims unquestionably satisfy the first five criteria in that: (1) this motion was brought within a reasonable time after the Claims were removed; (2) the Claims are based entirely on Connecticut law; (3) the Claims do not constitute core proceedings based on prevailing case law, *see supra.* ¶27, and for the reasons explained in Points i-ii, *supra*; (4) there is no basis for invoking federal jurisdiction beyond Section 1334; and (5) A state action based on the Claims is already commenced and is pending in State Court.

53.     As to the first factor, whether the motion to abstain has been timely brought, it has been held that a motion for mandatory abstention was timely brought when it was filed over eight months after removal, where the delay was the result of the movant's belief that a settlement was

possible. *Joremi Enterprises, Inc. v. Hershkowitz (In re New 118th LLC)*, 396 B.R. 885, 893 (Bankr. S.D.N.Y. 2008). The three factors identified by the court to determine whether such a motion is timely were (1) "whether the movant moves as soon as possible after he or she should have learned of the grounds for such a motion"; (2) "whether the moving party has already invoked the substantive process of the federal court on a matter going to the merits of the complaint, and in particular, moved for abstention only after receiving an unfavorable outcome"; and (3) "whether the granting of the motion would prejudice or delay the rights of others." *Id.* (internal quotations and citations omitted).

54.     Here, the Defendants offered no objection to the Trustee's removal of the Connecticut State Court Action and its transfer to this Court, and waited over one year after removal before advising the Plaintiffs and this Court that they do not consent to this Court entering final orders or judgments in the Adversary Proceeding. Based on Defendants' silence, and the fact that it was at the behest of the principal Defendant in this Adversary Proceeding, Mr. Fareri, that the Debtor voluntarily filed for chapter 7 relief in order to stay the Connecticut State Court Action, the Trustee was under the reasonable belief that the Defendants preferred that the matter be litigated – once – in this Court without going through proposed findings of fact and conclusions of law, followed by a de novo review in the district court. In addition, as in *New 118th LLC*, the parties did pursue settlement through a formal mediation, which took place on June 6, 2022. And finally, there would be no prejudice to any of the parties if the matter were remanded to the State Court. This motion has therefore been timely brought.

55.     As for the sixth and final criterion, the weight of authority holds that the party opposing mandatory abstention bears the burden of proving "'that the state court *cannot* adjudicate the claims in a timely manner'." *Core Litigation Trust v. Apollo Global Management, LLC (In re*

*AOG Entertainment, Inc.*), 569 B.R. 563, 573 (Bankr. S.D.N.Y. 2017) (quoting *BGC Partners, Inc. v. Avison Young (Canada), Inc.*, 919 F.Supp.2d 310, 319 n.66 (S.D.N.Y. 2013)) (emphasis in *BGC Partners* decision). Indeed, based on principles of comity and federalism, "the Court conclude[d] that the Defendants [bore] the burden of proving that mandatory abstention is not warranted." *AOG Entertainment*, 569 B.R. at 573.

56.     In any event, it has been held that the most important factor to determine "timely adjudication" "is the nature of underlying chapter proceeding." *Worldview Entertainment Holdings, Inc. v. Woodrow*, 611 B.R. 10, 19 (S.D.N.Y 2019). More particularly, "[i]n a chapter 7 proceeding, there is no administrative urgency or plan of reorganization to facilitate and timely adjudication can be weighed relatively lightly." *Id.*     *See also Joremi Enterprises, Inc. v. Hershkowitz (In re New 118th LLC)*, 396 B.R. 885, 895 (Bankr. S.D.N.Y. 2008) (subscribing to case law holding the "timely adjudication" factor satisfied where the dispute is not intertwined with a pending bankruptcy proceeding, is not complex, and is the type of dispute that the state court can adjudicate in a timely fashion, or when allowing an action to proceed in state court will not have any unfavorable effect on the administration of the bankruptcy case) (internal quotations and citations omitted).

57.     Here, this is a chapter 7 case where there is no administrative urgency or plan of reorganization to facilitate and allowing the Connecticut State Court Action to proceed will not have any unfavorable effect on the administration of the chapter 7 case.

58.     Moreover, the Claims are pending before the State Court which handles complicated commercial cases as a special unit of the Connecticut Superior Court. Although federal courts (and in particular bankruptcy courts) undoubtedly have the expertise needed to

resolve such issues, the State Court specializes in the resolution of precisely this type of commercial dispute.

59. For all of these reasons, this Court should abstain and remand the Claims to State Court under 28 U.S.C. § 1334(c)(2).

### iv.   In the Alternative, the Court Should Exercise Its Discretion To Abstain

60. Even if the Court were to conclude that it is not required to remand this case, *and that mandatory abstention does not apply*, this Court should nevertheless remand by exercising its discretion to abstain from hearing the dispute in the interest of comity with State courts and respect for State law pursuant to 28 U.S.C. § 1334(c)(1). Section 1334(c)(1) provides::

> [N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

61. The Court, in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) stated "(a)lthough this case falls within none of the abstention categories, there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."

62. The bankruptcy courts have not hesitated to apply the *Colorado River, Id.* abstention doctrine under the aegis of 28 U.S.C. §1334(c)(1), which states:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

63.     The Court, in *In re AOG Entm't, Inc.*, 2019 WL 1054921, at *8–9 (Bankr. S.D.N.Y.

Mar. 5, 2019) stated:

> Pursuant to 28 U.S.C. § 1334(c)(1), a court may abstain from hearing a proceeding
> within its jurisdiction "in the interest of justice, or in the interest of comity with
> State courts or respect for State law." Permissive or discretionary abstention was
> intended to codify non-bankruptcy judicial abstention doctrines, *Coker v. Pan Am.
> World Airways (In re Pan Am. Corp.)*, 950 F.2d 839, 845 (2d Cir. 1991), which
> recognized "the virtually unflagging obligation of the federal courts to exercise the
> jurisdiction given them." *Colorado River Water Conservation Dist. v. United
> States*, 424 U.S. 800, 817 (1976); *see also Lothian Cassidy, LLC v. Lothian Expl.
> & Dev. II, L.P.*, 487 B.R. 158, 165 (S.D.N.Y. 2013) (noting "presumption against
> abstention").
>
> The movant bears the burden of establishing that permissive abstention is
> warranted, *Bickerton v. Bozel S.A. (In re Bozel, S.A.)*, 434 B.R. 86, 102 (Bankr.
> S.D.N.Y. 2010), and the decision whether to abstain is committed to the Court's
> discretion. *See Abir v. Malky, Inc. (In re Abir )*, No. 09 CV 2871(SJF), 2010 WL
> 1169929, at *7 (E.D.N.Y. Mar. 22, 2010) (citing *In re Petrie Retail, Inc.*, 304 F.3d
> 223, 232 (2d Cir. 2002) ). Among the factors the Court may consider are:
> (1) the effect or lack thereof on the efficient administration of the estate if a Court
> recommends abstention, (2) the extent to which state law issues predominate over
> bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law,
> (4) the presence of a related proceeding commenced in state court or other
> nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. §
> 1334, (6) the degree of relatedness or remoteness of the proceeding to the main
> bankruptcy case, (7) the substance rather than form of an asserted 'core'
> proceeding, (8) the feasibility of severing state law claims from core bankruptcy
> matters to allow judgments to be entered in state court with enforcement left to the
> bankruptcy court, (9) the burden of [the court's] docket, (10) the likelihood that the
> commencement of the proceeding in a bankruptcy court involves forum shopping
> by one of the parties, (11) the existence of a right to a jury trial, and (12) the
> presence in the proceeding of nondebtor parties.

64.     The Court, in *In re New York City Off-Track Betting Corp.*, 434 B.R. 131, 148

(Bankr. S.D.N.Y. 2010) surveyed the law of the so-called *Magnolia* abstention doctrine, see,

*Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478 (1940), stating:

> As noted by the Second Circuit, the legislative history of historical section 1471(d)
> references a Supreme Court abstention case, *Thompson v. Magnolia Petroleum Co.,*
> 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940). *In re Pan Am.*, 950 F.2d at 845.
> The *Magnolia* Court concluded that abstention is most appropriate where state law
> issues predominate or when a case raises unresolved state law questions. *Rosetta
> Res. Operating LP v. Pogo Producing Co. (In re Calpine Corp.)*, 361 B.R. 665,

669–70 (Bankr.S.D.N.Y.2007) (interpreting the holding of *Magnolia* ) (citing *Magnolia,* 309 U.S. at 483, 60 S.Ct. 628). The Court notes that the reference to *Magnolia* in the legislative history could be interpreted to somehow limit the codification of abstention principles in section 1334(c) to the concepts within *Magnolia,* but observes that any such conclusion is at odds with the Second Circuit's clear direction that "section 1334(c)(1) should be informed by principles developed under judicial abstention doctrines"—not just the concept announced in *Magnolia. In re Pan Am.,* 950 F.2d at 846. Indeed, the district court decision the Second Circuit cited in support of its statement that section 1334(c) should be viewed through the prism of judicial abstention doctrines specifically stated that section 1334(c) "may summarize and incorporate federal non-bankruptcy abstention doctrines found in *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)." *In re Gen. Am. Commcns Corp.,* 130 B.R. 136, 146 (S.D.N.Y.1991).

65.     For the reasons set forth in support of remand under 28 U.S.C. § 1452(b), which considers the same factors that are considered for permissive abstention, this is a case where the bankruptcy court can, but should not, retain jurisdiction.

## CONCLUSION

For all of the foregoing reasons, the Plaintiffs respectfully request that this Court remand this proceeding to the State Court or abstain and remand based on mandatory or permissive abstention.

Dated: August 31, 2022

**PLAINTIFF,**
**HOWARD P. MAGALIFF,**
**TRUSTEE**

By: */s/ Irve J. Goldman*
Irve J. Goldman
Pullman & Comley, LLC
850 Main Street
Bridgeport, CT 06604
203-330-2000 (Tel.)
203-576-8888 (Fax)
igoldman@pullcom.com

**PLAINTIFF,**

**James Carnicelli, Jr.**

By: */s/ Joseph M. Pastore III*
Joseph M. Pastore III
Melissa Rose McClammy
Pastore LLC
420 Lexington Ave
Third Floor
New York, NY, 10170
Tel: (845) 667-5711
Jpastore@pastore.net
Mmcclammy@pastore.net

**PLAINTIFF,**

**James Carnicelli, Jr.**

By: */s/ Robert L. Rattet*
Robert L. Rattet
James B. Glucksman
120 Bloomingdale Road
White Plains, New York 10605
Tel: (914) 381-7400
rlr@dhclegal.com
jbg@dhclegal.com

# Exhibit A

Award of Arbitrators

<u>AMERICAN ARBITRATION ASSOCIATION</u>
<u>Construction Industry Arbitration Tribunal</u>

In the Matter of the Arbitration between:

James Carnicelli, Jr. derivatively on behalf of

THE GATEWAY DEVELOPMENT GROUP, INC.

                                        Claimant,

        -and-

GATEWAY KENSINGTON, LLC. ,

                                     Respondent.

Case No. 01-19-0004-4927

## AWARD OF ARBITRATORS

We, the undersigned arbitrators, having been designated in accordance with the arbitration agreement contained in the contract titled "Construction Management Agreement By and Between Gateway Kensington LLC and The Gateway Development Group, Inc." dated "as of May 5, 2014" ("Contract") and duly executed by Gateway Kensington LLC ("Kensington") and The Gateway Development Group, Inc. ("Development") ("Kensington" and "Development" collectively "Parties"), having been duly sworn, and having heard the proofs and allegations of the Parties issue this Final Award of Arbitrators ("Final Award"). This arbitration proceeding was conducted under the American Arbitration Association's Construction Industry Arbitration Rules. Eight evidentiary hearings were held from December 8, 2020 through December 18, 2020, during which both fact and expert witnesses were called to testify by the Parties. The Parties were represented by counsel, to wit, Claimant was represented by Steven L. Levitt and Trevor Gomberg of Levitt, LLP and Respondent was represented by Timothy T. Corey, Jared Cohane and Molly M. Quinn

of Hinckley Allen & Snyder, LLP.   The Parties submitted post-hearing briefs and reply briefs which were received by the Panel. After receipt of the briefs, with leave of the Panel, the Parties submitted letters concerning certain matters raised in the briefs. The hearings were deemed closed on March 12, 2020, and by agreement of the parties the Award was due 45 days after closing.

## THE PARTIES

The claim is brought derivatively by James Carnicelli, Jr. ("Carnicelli") as minority shareholder of Development (49%) on behalf of Development to enforce its rights under the Contract. Carnicelli was the president of Development and ran its day-to-day operations. John Fareri ("Fareri") was the majority shareholder (51%) of Development. Development was a construction management firm whose work mainly consisted of construction projects performed for its majority owner Fareri.

Fareri is a real estate developer, and in addition to holding a majority interest in Development, held a majority interest in Kensington (99%) with the remaining interest (1%) held by his spouse.   Kensington was formed to acquire, remediate, and develop a parcel of land in Bronxville, New York which is the subject of this dispute ("Project"), and Kensington retained Development as its construction manager for the Project. The Project had a Brownfield component to it whereby Fareri, personally, could obtain income tax credits for remediating and developing the site. The amount of the tax credit was primarily based on the cost of the cleanup and the cost of the construction of the buildings and appurtenant structures on the site.   The tax credit was available for Site Preparation work (contamination remediation) and for Tangible Property work (above ground construction).

## THE PLEADINGS & PRIOR PROCEEDINGS

Demand for Arbitration

In its Demand for Arbitration, Development, through Carnicelli, alleged a breach of the Contract by Kensington for failing to pay the fees due to Development under the Contract. In an amplification of the claim submitted through a Detailed Statement of Claim which the Panel required of the Parties, Carnicelli also requested a dissolution of Development in addition to the breach of contract claim. Respondent moved to dismiss the dissolution claim on the grounds that the matter was not properly before the Panel, and that claim was dismissed by Order of the Panel dated June 24, 2020. The dismissal was solely based on jurisdictional grounds, and the Panel made no substantive ruling on the request for dissolution.

Answering Statement and Counterclaim

Aside from what amounts to a general denial of the breach of contract claim and the objection to the dissolution claim discussed above, Kensington asserted several counterclaims. The first alleged a breach of the Contract by Development for overbilling and improper charges against the Project by Development acting through Carnicelli. In total Kensington sought $2,982,919.43 in damages. Kensington also asserted a breach of fiduciary duties claim against Carnicelli arising out of the same alleged excessive and improper billing against the Project by Development which, it claimed, were inconsistent with the Contract. In response to Kensington's motion to dismiss the dissolution claim, Development cross-moved to dismiss the breach of fiduciary duty claim which the Panel denied by the Order dated June 24, 2020 with leave to renew at the end of the proofs. This renewal of the motion proved unnecessary as shortly before the hearings, Kensington withdrew its counterclaims.

# **FACTUAL BACKGROUND**

The Project

It is undisputed that Fareri through his real estate development company Fareri Associates, bid on and was selected by the Town of Bronxville as the developer of the Project. The contract of sale was eventually assigned to Kensington, a sole purpose entity, formed to purchase and develop the Property. Kensington proposed to clean-up the site and build condominiums. Kensington submitted an application to the New York State Department of Environmental Conservation ("NYSDEC") for acceptance into the Brownfield Cleanup Program. Kensington was accepted into the program, and in June 2014, Kensington and NYSDEC entered into a Brownfield Cleanup Agreement ("BCA") (R[1]-87). As stated above, the BCA provided for tax credits for Fareri personally based upon the success and cost of the Site Preparation work and the Tangible Property work.

Agreements Between Kensington & Development for the Project

There were two agreements for the Project executed by the Parties. The first is dated December 7, 2015 for construction management services to be provided by Development. It is on standard AIA form A134-2009 titled "Standard Form of Agreement Between Owner and Construction Manager as Constructor where the basis of payment is the Cost of the Work Plus a Fee without a Guaranteed Maximum Price." (R-148, hereinafter "A134 Agreement") This standard form of agreement calls for the construction manager (Development) to bill the owner

---

[1] References to "R- " and "C- " are to hearing exhibits submitted by Respondent ( R) and Claimant ( C)

(Kensington) for the "cost" of the work, a defined term, plus a Construction Management Fee. In the A134 Agreement, the Construction Manager's fee was set at $0.00.

Throughout the remediation portion of the work at the Project and through the construction of the condominium structure, Development invoiced Kensington for the work consistent with the December 7, 2015 agreement. That is, invoices were sent for the cost of the work as billed by trade contractors and for the labor and other services provided by Development itself to the Project without mark-up and without a construction manager fee added. These invoices were paid, except for a small balance, by Kensington. The Site Preparation remediation work was completed in late 2016 and a Certificate of Completion was issued by NYSDEC on December 28, 2016. (C-22)

The document which is the subject of this dispute, the Contract, was dated "as of May 5, 2014," the approximate date when the Project commenced, and was indisputably executed on or about March 9, 2018 by Fareri on behalf of Kensington and Carnicelli on behalf of Development. At the time it was signed, the remediation work had been certified as complete by NYSDEC, and 97% of the overall project was certified to have been completed (R-12) The Contract provides for higher amounts to be paid to Development for its personnel performing work on the Project based upon market rates as found in the RSMeans estimating guide ("RSMeans"). In addition, the Contract provides for a construction management fee of 10% on the "Cost" of the work as defined in the Contract, plus a $1,250,000.00 bonus conditioned upon early completion of Brownfield Cleanup work. As stated above, it is undisputed that the Contract was signed by Carnicelli on behalf of Development and Fareri on behalf of Kensington.

The Brownfield Credit & Audit

In 2017, after receiving the Certificate of Completion for the Brownfield remediation work from NYSDEC, Kensington filed an IT-611.1 form with New York State requesting the tax credits (C-20). The IT-611.1 and accompanying schedules were prepared by in-house employees of Fareri and Kensington with the assistance and advice of outside consultants. Carnicelli was involved to the extent that he was asked by Kensington and did provide information to match Development personnel with the RSMeans categories. In arriving at the costs upon which the credit would be calculated, the IT-611.1 used the RSMeans rates for Development's employees, a completion bonus of $1,250,000.00, and a 10% construction manager's fee.

No back-up documents were required or submitted with the IT-611.1 but detailed schedules were attached showing the costs incurred for the remediation of the site from trade subcontractors and other entities providing work, labor, and services to the Project. The schedules also include the market RSMeans rates for Development personnel, a 10% construction manager's fee and a $1,250,000.00 early completion bonus for Development. By letter of December 30, 2017, the New York State Department of Finance commenced an audit of the tax credit application and requested back-up documents from Fareri and his wife Brenda Fareri to support the costs alleged to have been incurred by Kensington for the remediation. (C-33). Among the documents requested by NYS were specified invoices from certain vendors, among them, those supporting the claim for the work performed by Development, and the contract between Development and Kensington.

Admitted into evidence were a series of emails between Fareri's in-house employees including his chief financial officer Chris Sheskier, CPA and Joseph Moukattaf, some of which had Development's Carnicelli participating or copied, concerning the creation of a new

construction management agreement to submit to NYS in response to the audit request. This resulted in the creation of the Contract, the terms of which were dictated by Kensington. The allowable charges and fees to be paid to Development under the Contract were consistent with the charges claimed in the IT-611.1.

In addition to the Contract, after NYS's request for supporting back-up for the charges, Fareri's in-house representatives prepared new invoices from Development to Kensington consistent with the amounts claimed on the IT-611.1. The dates and invoice numbers of these new invoices were consistent with the actual invoices submitted contemporaneously by Development and paid by Kensington, but the amounts were based upon the RSMeans rates as provided in the Contract.

Among other things, the Contract and the new invoices were presented by Kensington to NYS in response to its audit. After some additional requests from NYS and submissions by Kensington, in July 2018 the Department of Finance finalized the audit, and with some adjustment downward, certified a $6,284,540.00 tax credit for the Site Preparation work that could be claimed by Fareri.

Thereafter, Kensington submitted its IT-611.1 for the Tangible Property portion of the Project using the Contract and the RSMeans rates and a 10% construction manager fee.

In the summer and fall of 2019 a dispute arose between Carnicelli and Fareri concerning the compensation to be paid to Development by Kensington on the Project. When Carnicelli rejected an offer from Fareri to settle claims on the Project and others performed by Development for Fareri entities, Carnicelli was summarily discharged from Development by Fareri, was locked out of the office by Fareri, and Development ceased to operate. Carnicelli was discharged on October 18, 2019. (C-85)

On December 30, 2019 Mr. Sheskier sent a letter on "John Fareri" personal letterhead to the NYS Audit Bureau confirming a conversation of November 8th in which Sheskier stated that certain cost "discrepancies" related to the Tangible Property Credit shown on the IT-611.1 for the tax year 2017 had been found and the costs were overstated (R-108). In the letter, Mr. Sheskier noted that Kensington was in the process of an "internal audit" which would result in the removal of certain costs from the submission. With the letter, Kensington submitted an amended IT-611.1 for the Tangible Tax Credit which eliminated all Development labor charges. The amended IT 611.1 for the Tangible Site Credit was ultimately approved by New York State.

As to the already approved Site Preparation Credit, on November 25, 2020, Kensington submitted a Voluntary Disclosure Application with NYS stating that the 2016 Site Preparation Credit for 2016 had been overstated and requesting permission to amend its IT-611.1 which had been approved by NYS in July 2018. As of the conclusion of the hearings, NYS had not acted on the request to amend the IT-611.1 for the Site Preparation work.

## CLAIMS OF THE PARTIES

Claims of Carnicelli on behalf of Development

Carnicelli's claim on behalf of Development is quite straightforward. He seeks to enforce the terms of the Contract and be paid as shown on the new invoices. He alleges that the Contract was not conditioned upon receipt of the tax credits by Fareri, and that Development is entitled to the benefits of the Contract including the completion bonus, the construction management fee and the costs based upon the RSMeans rates. Carnicelli further argues that although he was involved with and did prepare the drafts and final version of the Contract, the terms of the Contract were dictated by Fareri's representatives to increase the tax credit and to fulfill Fareri's agreement to

fairly compensate Development for its work on the Project. Carnicelli also argues that he was not involved with the tax credit applications which benefited Fareri only.

Claims and Defenses of Kensington

Kensington did not initially plead nor argue in its pre-hearing submissions and motion papers that the Contract was unenforceable, and in fact, Kensington asserted counterclaims based upon the Contract. Shortly before the hearings began, Kensington's position changed, and the central point of Kensington's defense at the hearings was that Fareri was unaware that (1) the Contract, which he admittedly signed on behalf of Kensington, was inconsistent with the actual billings of Development; (2) that the tax credit submissions and his personal tax returns included costs based upon the Contract, or (3) that new invoices were created and submitted to support the costs.

Aside from this professed ignorance of the tax credit application filings, Fareri asserted that the filings were fraudulent and improper, and Development's claim could not be rightly sustained based upon these fraudulent documents and filings. He alleges that the Contract and the new invoices were created solely to improperly support an increased tax credit for himself. He further alleges that he is attempting to correct the tax credit filings for the Site Preparation Credit and has amended the Tangible Property Credit application to delete all Development billings for its own personnel. Fareri concedes additional compensation is due to Development but less than what is provided for in the Contract.

In response to Kensington's defense, Carnicelli argues that the Contract was signed by Kensington and Development and is a binding obligation and should be enforced. Carnicelli further argues that the increase in fees and reimbursements to Development were a way for Fareri

and Carnicelli to "true up" the actual fees to be paid to Development which he alleges Fareri and

he had orally agreed to do after completion of the Project.

## **DISCUSSION & FINDINGS**

Summary of Findings

For the reasons set forth below, we find the Contract to be a valid and binding

obligation of Kensington and should be enforced in accordance with its terms. Summarily, the

Contract was admittedly executed by Carnicelli on behalf of Development and Fareri on behalf of

Kensington, and until the eve of the hearings, Kensington affirmatively argued that the Contract

was valid. It sought damages of approximately $3,000,000.00 for breach of the Contract and

breach of fiduciary duty owed under the Contract by Development (see, Answering Statement; see

Fareri Declaration Affidavit (C-93).

As stated above, shortly before the first evidentiary hearing, after discovery was

virtually complete, Development disavowed the validity of the Contract, withdrew its counterclaim

and argued that the Contract was created by Carnicelli and employees of Fareri without his

knowledge for fraudulent purposes (which notably benefitted Fareri personally), and so, the

Contract was not enforceable at all. During the hearings, Kensington admitted a contractual

relationship existed between it and Development, and that Development was owed more than what

it had been paid. However, Kensington vacillated as to the terms of the agreement and what

precisely was owed to Development. Under these circumstances we find the Contract, admittedly

executed freely by Carnicelli and Fareri, to be the accurate representation of the agreement of the

parties and should be enforced.

Moreover, Kensington, relying on the advice of an expert it had retained, recorded liabilities to Development for project costs it incurred in calendar years 2016 and 2017 upon which it relied when reporting the project costs on both its Federal and New York State Partnership Returns, all executed under penalties of perjury affirming these legal obligations. The liabilities included in the Contract are the liabilities Kensington previously recorded and on which it relied to claim millions of dollars of Brownfield Tax Credits ("BTC") from New York State which were allocated to its members. We were not persuaded by Kensington's and Fareri's attempts to amend the returns and filings after the dispute with Development arose and Development sought the benefits of the Contract.

<u>Respondent's Answering Statement and Detailed Statement of Setoff and Counterclaim</u>

In Respondent's Answering Statement and Detailed Statement of Setoff and Counterclaim dated May 22, 2020 ("Answering Statement"), Kensington did not claim the Contract was invalid, but conceded that the Contract was a valid agreement entered into by Development and Kensington (Answering Statement, par. 5) and that it was breached by Development. Kensington referenced each of the terms of the Contract that it now seeks to avoid; the "reimbursable rates for project staff for the cost of the Project.....;" (the rates referenced are the RSMeans rates found in the Contract); "under Article VII of the (Contract) the Construction Manager was only entitled to a 10% fee for 'Site Prep' costs associated with the Brownfield remediation phase[2], plus a one-time bonus of $1,250,000.00....." (Answering Statement, Par. 6).

Thus, Kensington did not contest the RSMeans rates, the "one-time bonus" or the construction management ("CM") fee on the site preparation work. It did not allege that

---

[2] Development seeks 10% construction management fee on the Tangible portion of the Project as well.

Kensington's internal audit revealed that RS Means rates, the CM fee and the bonus were improper charges as it now does.  Rather, Kensington alleged that the internal audit in November 2019 instead found overbillings by Development having nothing to do with the RSMeans rates, the CM fee or the bonus.  Kensington alleged that Carnicelli, acting through Development, breached the Contract by overbilling the Project through overstaffing and billing for work performed at other Projects. (Answering Statement, par. 6)

Specifically, Kensington alleged that Development "billed for project managers and staff at 4.33 weeks per month, regardless of whether staff was on vacation, sick or working on other projects......" thereby overbilling the Project by $291,930.00.  (Answering Statement, par.13)   It further alleged that Development "overstaffed the Project........, including between five and six full-time managers, when the needs of the Project should have required no more than three full-time management personnel" for an overcharge of $259,800.00. (Answering Statement, par.14) Also, among other things, Kensington argued that Development billed $1,458,282.72 for vendors supplying work to other projects including Carnicelli's private residence (Answering Statement, par. 9).   In all Kensington claimed that Development owed Kensington nearly $3,000,000.00 for charges that were not in accordance with the Contract.

The Answering Statement also confirmed that "Kensington submitted the (Contract) and labor invoices for audit by NYSDEP in conjunction with obtaining the (Brownfield) credit." (Answering Statement, par. 7)

Although the affirmative counterclaim was ultimately withdrawn by Kensington through its Amended Answering Statement dated September 23, 2020, the withdrawal did not come with a clear repudiation of the Contract, but rather, with an acknowledgment of the existence

of the Contract but "leav(ing) the Claimant to its proof as to its operative effect." (see, Amended

Answering Statement) There was no mention of illegality or fraud in this amended pleading.


Fareri Declaration

Kensington also submitted a sworn Declaration from Fareri dated January 31, 2020

in conjunction with Kensington's motion to dismiss. In that sworn statement, which he stated was

"based upon personal knowledge," Fareri again did not deny the Contract's validity but made the

same claims concerning overbilling, overmanning of the Project, and submission of vendor

invoices by Development for work on other projects in breach of Development's obligations under

the Contract. (C-93)


Fareri Hearing Testimony

In his hearing testimony, Mr. Fareri, in effect, repudiated the A134 Agreement and

the Contract, but stated that Development was due more than just the pass-through sums described

in the A134 Agreement, but not as much as required by the Contract. He further testified that he

was unsure of the amount actually due to Development in addition to what had been paid, at times

claiming that approximately $810,000.00 was due (see Hearing testimony, Day 7, pages 1564-

1568), and later $510,795.00 (Id, page 1575). There was also some vague testimony that the 1%

shown on the pro formas submitted to Kensington's lender was the proper CM fee due to

Development, which, it was claimed, would have been paid had Development simply billed it.

We find Fareri's testimony that he was unaware of the existence of the Contract or

its terms, and that it was prepared solely for nefarious purposes (for the benefit of Fareri

personally) by Mr. Sheskier, Joseph Moukattaf and Fareri consultants to be inaccurate at best, at

the very least unpersuasive, and inconsistent with his Declaration.   This testimony is belied by, among other things, the fact that although Fareri contends that Mr. Sheskier created and submitted fabricated documents and invoices to governmental authorities placing Fareri in serious criminal jeopardy, Mr. Sheskier is still employed by Fareri and is apparently managing his attempts to withdraw these purportedly fraudulent documents.   Additionally, Mr. Sheskier continues to be Fareri's attorney-in-fact.   In any event, Fareri is a sophisticated businessman who is bound by documents he willingly executed including the Contract.

We also find that filings and payment applications submitted to Kensington's lender do not control the contractual relationship between Development and Kensington, and so, they do not impact our view that the Contract should be enforced in accordance with its terms.

We further find Kensington's contention that the Contract applied only to the Site Preparation work and not the Tangible Property work to be unsupported by the language of the Contract itself and inconsistent with Kensington's own records.

## The Brownfield Tax Credit Issue ("BTC")

As stated above, Kensington ultimately argued that the Contract created to support the BTC it claimed for 2016 and 2017 was prepared without Fareri's knowledge for the illegitimate purpose of increasing Mr. and Mrs. Fareri's BTC, and so, unenforceable.   We reject this contention for several reasons.

First, Kensington retained the services of an expert to advise it on how to maximize the tax credit and accepted the advice of that expert in establishing rates and costs to be paid to Development consisting of the RSMeans labor rates, a bonus, and a CM fee.   Second, Kensington recorded these costs as amounts payable to Development for 2016 and 2017 prior to executing the

Contract which, by its execution, ratified its prior actions recording the amounts payable to Development. Finally, as stated above, we find not credible Fareri's testimony that he was unaware of these activities and the filing of the IT-611.1 forms and tax returns, submitted under oath, which inured only to his personal benefit.

We note that Fareri took full advantage of the actions of Mr. Sheskier, Mr. Moukattaf and his consultants until October 2019 when Mr. Carnicelli sought the benefits of the Contract, after which he was summarily discharged, and Kensington sought to disavow the documents and filings. We also find that in creating the Contract, Kensington dictated the terms and did so for dual purposes, first to increase the Brownfield tax credit, but also to fairly compensate Development for its services. This is supported by Fareri's testimony that the A134 Agreement did not accurately reflect what Development was to be paid for its services. Concerning the tax credit filings, the evidence established that the filings, with their detailed schedules, were prepared by and filed by Mr. Scheskier and Mr. Moukattaf. Carnicelli's involvement consisted of the preparation of the Contract whose terms were dictated by Mr. Sheskier and Mr. Moukattaf and matching Development workers to the categories found in RSMeans. We found no credible evidence to support a finding of fraud by Carnicelli or Development.

Regardless, we heard no testimony to support the contention that matching the remediation and construction costs to market rates and submitting them to support a tax credit would be improper, provided that the costs are actually paid. It is obvious that filing documents showing higher costs than actually incurred would be improper, but here Kensington, by the written Contact, bound itself to pay the additional costs. In fact, as noted above, Fareri conceded that Development was due more than the pass-through amounts it was paid although he was unable

to precisely arrive at the amount actually due, in effect saying that it was more than the A134 Agreement but less than provided for in the Contract.

## Monetary Award

Claimant submitted an expert report from Scott Rutter, CPA of CitrinCooperman, and Mr. Rutter testified at the hearings. The report and testimony followed the terms of the Contract. In arriving at each component of damages, Mr. Rutter calculated the amount due under the Contract and subtracted the amount previously paid to Development to arrive at the amount he claimed was due to Development. In the instances where actual invoices to calculate costs were not available to him, he credibly extrapolated the amount due from ancillary documents that we found to be sufficient.

Respondent submitted a report from Patrick A. McGeehin of FTI Consulting, and Mr. McGeehin testified at the hearings. Although a credible witness, Mr. McGeehin did not contest the amount of the damages found in the Rutter report, but rather relied almost exclusively on the position that the Contract was unenforceable. As stated above, we have found the Contract to be enforceable, and so we have not incorporated Mr. McGeehin's calculation of damages in this Award although his opinion was considered.

In accordance with the findings above, we Award Claimant, The Gateway Development Group, Inc., the following:

| | | |
|---|---|---|
| 1. | Site Prep Labor Balance Due– 2016 | $1,571,329.00 |
| 3. | Site Prep Work Bonus – 2016 | $1, 250,000.00 |
| 4. | Site Prep Construction Manager's Fee – 2016 | $1,151,031.00 |

| 5. | Tangible Labor Balance Due– 2017 | $2,475,812.00 |
| 6. | Tangible Portion Bonus - 2017 | $0.00 |
| 7. | Tangible Construction Manager's Fee – 2017 | $4,486,983.00 |
| 8. | Tangible Labor Balance Due - 2018 | $1,023,247.00 |
| 9. | Tangible Portion Bonus - 2018 | $0.00 |
| 10. | Tangible Construction Manager's Fee – 2018 | $534,394.00 |
| 11. | Tangible Labor Balance Due - 2019 | $181,388.00 |
| 12. | Tangible Portion Bonus - 2019 | $0.00 |
| 20. | Tangible Construction Manager's Fee – 2019 | $43,173.00 |
| | TOTAL | $ 12,717,357.00 |

Interest, Costs and Counsel Fees

We have determined that the appropriate starting point for interest is December 31, 2019, and the appropriate interest rate to be New York's statutory rate of 9% per annum.

As to Development's claim for costs and counsel fees, the Contract does not provide for a prevailing party award of counsel fees. Rule 48 (d)(ii) permits the panel to award counsel fees if all parties request them. Here, Claimant and Respondent initially requested an award of costs and counsel fees but, with the permission of the Panel, Respondent withdrew its counterclaim which included the request for the award of costs and counsel fees, and so, we are without authority to make such an award under Rule 48 (d)(ii).

Claimant has argued that under New York Business Corporation Law 626(e), Mr. Carnicelli is entitled to an award of cost and fees to himself, individually, from Respondent. That statute, however, concerns the award of counsel fees to a shareholder from the corporation on

whose behalf she or he successfully prosecuted a claim, in this case from Development. The statute does not increase the liability of a defendant (Kensington) for attorneys' fees and costs from what would be available in a non-derivative action.

In denying the claim for counsel fees, we make no determination concerning Mr. Carnicelli's entitlement through New York Business Corporation Law 626(e), shareholders' agreement or otherwise to reimbursement of fees and costs from Development that he may have advanced to prosecute the claim. However, that is not a matter properly before the Panel, and we must leave it to be decided in another forum.

The administrative fees of the American Arbitration Association totaling $30,110.38 and the compensation of the arbitrators totaling $163,059.00 shall be borne by Kensington. Therefore, Kensington shall reimburse Carnicelli the sum of $104,640.38, representing that portion of said fees in excess of the apportioned costs previously incurred by Carnicelli.

Accordingly, within 30 days of the date of this Award, Respondent Gateway Kensington, shall pay to Claimant The Gateway Development Group, Inc. the sum of $12,717,357.00, plus interest from December 31, 2019 to April 26, 2021 totaling $1,511,449.00, plus arbitration compensation and AAA fees in the amount of $104,640.38 for a total Award of $14,333,446.38. If payment is not made within the 30 days allotted above, interest will accrue thereafter on any unpaid amount at the statutory judgment rate of 9% per annum.

To the extent that claims or defenses are not specifically mentioned above, they were considered and rejected. This Award is in full settlement of all claims and counterclaims submitted in this Arbitration. All claims not expressly granted herein are hereby denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

4/25/2021
_____
Date

_____
Thomas J. Rossi


_____
Date

_____
Peter Liloia III


_____
Date

_____
William Chandler

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

4/25/21
_____
Date

_____
Thomas J. Rossi

I, Peter Liloia III, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____
Date

_____
Peter Liloia III

I, William Chandler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____
Date

_____
William Chandler

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_____                    _____
Date                                       Thomas J. Rossi


_____                    _____
Date                                       Peter Liloia III


_____4/23/2021_____                    _____
Date                                       William Chandler

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.


_____                    _____
Date                                        Thomas J. Rossi


I, Peter Liloia III, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.


_____                    _____
Date                                        Peter Liloia III


I, William Chandler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.


  4/23/2021_____                    _____
Date                                        William Chandler

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_____
Date

_____
Thomas J. Rossi

_APRIL 23, 2021_
Date

_____
Peter Liloia III

_____
Date

_____
William Chandler

19

I, Thomas J. Rossi, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____          _____
Date                                                    Thomas J. Rossi


I, Peter Liloia III, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

*APRIL 23, 2021*                              _____
Date                                                    Peter Liloia III


I, William Chandler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____          _____
Date                                                    William Chandler

# Exhibit B

Connecticut Civil Action, Docket No. 127.00 and No. 127.01

DOCKET NO: FSTCV206048778S

SUPERIOR COURT

CARNICELLI, JR, JAMES
    V.
FARERI, JOHN J Et Al

JUDICIAL DISTRICT OF STAMFORD
    AT STAMFORD

4/7/2021

## ORDER

ORDER REGARDING:
03/31/2021 127.00 SCHEDULING ORDER

The foregoing, having been considered by the Court, is hereby:

ORDER:

The joint proposed scheduling order is approved. In addition, the Court sets forth the following scheduling orders:

1) Joint Trial Management Report due 2/17/23. Counsel shall follow this Court's standing order on the content of Joint Trial Management Reports;

2) Trial Management Conference is scheduled for 2/17/23;

3) Jury selection is scheduled for 3/14/23;

4) Evidence shall commence on 3/27/23.

Judicial Notice (JDNO) was sent regarding this order.

429710

Judge: SHEILA ANN OZALIS
Processed by: Catherine Sparano

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

| DOCKET NO. FST-CV-20-6048778-S | : | SUPERIOR COURT |
|---|---|---|
| JAMES CARNICELLI, JR., | : | JUDICIAL DISTRICT OF |
| Plaintiff, | : | STAMFORD/NORWALK |
| vs. | : | AT STAMFORD |
| JOHN J. FARERI, JULIE FARERI, CHRISTOPHER SHESKIER, and THE GATEWAY DEVELOPMENT GROUP, INC., | : | |
| Defendants; | : | |
| and | : | |
| JAMES CARNICELLI, JR., | : | |
| Derivative Plaintiff, | : | |
| vs. | : | |
| JOHN J. FARERI, JULIE FARERI, and CHRISTOPHER SHESKIER, | : | |
| Derivative Defendants, | : | |
| and | : | |
| THE GATEWAY DEVELOPMENT GROUP, INC., | : | |
| Nominal Defendant | : | MARCH 31, 2021 |

## JOINT CASE MANAGEMENT SCHEDULE

Plaintiff James Carnicelli, Jr. ("Plaintiff") and Defendants John J. Fareri, Julie Fareri, Christopher Sheskier and The Gateway Development Group, Inc. (collectively, "Defendants"), hereby submit this proposed Joint Case Management Schedule, as follows:

|  | Proposed Deadlines |
| --- | --- |
| Pleadings will be closed by | March 1, 2022[1] |
| Written discovery to be completed by (Completion includes resolution of all objections and answers/compliance provided) | September 1, 2021 |
| Depositions of defendants to be completed by | December 31, 2021 |
| Depositions of plaintiff to be completed by | December 31, 2021 |
| Depositions of all fact witnesses to be completed by | December 31, 2021 |
| Plaintiff to disclose experts by | January 31, 2022 |
| Depositions of Plaintiff's experts by | March 1, 2022 |
| Defendants will disclose experts by | April 1, 2022 |
| Deposition of Defendants' experts will be completed by | May 1, 2022 |
| Dispositive motions will be filed by | June 1, 2022 |
| Opposing memorandum/affidavits by | 45 days after filing dispositive motion |
| Reply memorandum by | 14 days after filing opposing memorandum |
| Argument scheduled for | TBD – to be discussed with the Court |
| Joint Trial Management Report due | 1 week before Trial Management Conference |
| Trial Management Conference scheduled for | TBD – to be discussed with the Court |
| Date to Begin Trial/Jury Selection | TBD – to be discussed with the Court |
| Preliminary estimate of trial length (excluding jury selection) | 10 days |

[1] This deadline contemplates adjudication of Defendants' Request to Revise, Motion to Strike, and a possible second Motion to Strike with respect to any Substituted Complaint filed by the Plaintiff, as well as adjudication of Plaintiff's Motion to Dismiss, Request to Revise and Motion(s) to Strike any counterclaim(s) that may be filed by Defendants.

Respectfully submitted,

THE PLAINTIFF,

JAMES CARNICELLI, JR.

By: */s/ Joseph M. Pastore*
Joseph M. Pastore III, Esq.
Melissa Rose McClammy, Esq.
Pastore & Dailey LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
jpastore@psdlaw.net
mmcclammy@psdlaw.net
Firm Juris #433711
P: 203-658-8454
F: 203-348-0852

THE DEFENDANTS,

JOHN J. FARERI, JULIE FARERI,
CHRISTOPHER SHESKIER, and THE
GATEWAY DEVELOPMENT GROUP,
INC.

By: */s/ Sara J. Stankus (435375)*
Timothy T. Corey, Esq.
Christopher V. Fenlon, Esq. (Pro Hac Vice)
Sara J. Stankus, Esq.
HINCKLEY, ALLEN & SNYDER LLP
20 Church Street, 18th Floor
Hartford, CT 06103
Firm Juris #428858
P: 860-725-6200
F: 860-278-3802
tcorey@hinckleyallen.com
cfenlon@hinckleyallen.com
sstankus@hinckleyallen.com
-Counsel for all defendants-

-and-

By: */s/ Johanna G. Zelman*
Johanna G. Zelman
Elizabeth M. Smith
FORDHARRISON, LLP
CityPlace II
185 Asylum St., Ste. 610
Hartford, CT 06103
Firm Juris #426943
P: 860-741-1361
F: 860-578-2075
jzelman@fordharrison.com
esmith@fordharrison.com
-Counsel for The Gateway Development
Group, Inc. and John J. Fareri-

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing was sent by email this 31st day of March, 2021, to all counsel and self-represented parties of record.

Joseph M. Pastore III, Esq.
Melissa Rose McClammy, Esq.
Pastore & Dailey LLC
4 High Ridge Park, Third Floor
Stamford, CT 06905
jpastore@psdlaw.net
mmcclammy@psdlaw.net

By /s/ Sara J. Stankus (435375)
Sara J. Stankus