# EXHIBIT 1

1  UNITED STATES BANKRUPTCY COURT
2  SOUTHERN DISTRICT OF NEW YORK
3  Case No. 21-22274-rdd
4  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
5  In the Matter of:
6  GATEWAY KENSINGTON LLC,
7        Debtor.
8  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
9  Case No. 21-22304-rdd
10 - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
11 In the Matter of:
12 THE GATEWAY DEVELOPMENT GROUP, INC.,
13       Debtor.
14 - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
15              United States Bankruptcy Court
16              300 Quarropas Street, Room 248
17              White Plains, NY 10601
18              July 12, 2021
19              10:36 AM
20
21 B E F O R E :
22 HON ROBERT D. DRAIN
23 U.S. BANKRUPTCY JUDGE
24
25 ECRO: A. VARGAS

Page 2

1  HEARING re Motion to Sell Property Free and Clear of Liens
2  Under Section 363(f) Debtors Motion for an order (I)
3  Authorizing the Sale of 15 Kensington Road #104, Bronxville,
4  New York; and (II) Authorizing the Assumption of the
5  Purchase and Sale Agreement in connection therewith filed by
6  Erica Feynman Aisner on behalf of Gateway Kensington LLC
7  with hearing to be held on 7/12/2021 at 10:00 AM at
8  Videoconference (ZoomGov)(RDD) (ECF #32)
9
10 HEARING re Objection to Motion for an Order (I) Authorizing
11 the Sale of 15 Kensington Road Bronxville, NY and (II)
12 Authorizing the Assumption of the Purchase and Sale
13 Agreement in Connection Therewith (related document(s)32)

25 Transcribed by: Sonya Ledanski Hyde

Page 3

1  A P P E A R A N C E S :
2
3  KIRBY AISNER CURLEY LLP
4     Attorneys for Gateway Kensington LLC
5     700 Post Road, Suite 237
6     Scarsdale, NY 10583
7
8  BY: ERIC FEYNMAN EISNER
9
10 DAVIDOFF HUTCHER CITRON LLP
11    Attorneys for James Carnicelli Jr.
12    605 Third Avenue
13    New York, NY 10158
14
15 BY: ROBERT LESLIE RATTET
16
17 PASTORE DAILEY LLC
18    Attorneys for James Carnicelli Jr.
19    4 High Ridge Park, 3rd Floor
20    Stamford, CT 06905
21
22 BY: JOSEPH M. PASTORE

Page 4

1  UNITED STATES DEPARTMENT OF JUSTICE
2     Attorneys for the U.S. Trustee
3     201 Varick Street, Suite 1006
4     New York, NY 10014
5
6  BY: BRIAN MASUMOTO
7
8  MORITT HOCK HAMROFF LLP
9     Attorneys for Sterling National Bank
10    400 Garden City Plaza
11    Garden City, NY 11530
12
13 BY: THERESA A. DRISCOLL
14
15 LEVITT LLP
16    Attorneys for James Carnicelli Jr.
17    Two Hillside Avenue, Building F
18    Williston Park, NY 11596
19
20 BY: STEVEN L. LEVITT
21    TREVOR M. GOMBERG

Page 5

1  REICH REICH REICH, P.C.
2     Attorneys for Gateway Development Group, Inc.
3     235 Main Street, Suite
4     White Plains, NY 10601
5
6  BY: JEFFREY A. REICH
7
8  RICH MICHAELSON MAGALIFF, LLP
9     Attorneys for the Trustee
10    335 Madison Avenue, 9th Floor
11    New York, NY 10017
12
13 BY: HOWARD P. MAGALIFF
14
15 BENOWICH LAW, LLP
16    Attorneys for John Fareri, Julie Jareri & Chris
17    Sheskier
18    1025 Westchester Avenue
19    White Plains, NY 10604
20
21 BY: LEONARD BENOWICH

2 (Pages 2 - 5)

1  ALSO PRESENT TELEPHONICALLY:
2
3  JAMES R. ANDERSON
4  RICHARD MORRISSEY
5  CARLOS J. CUEVAS
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1           P R O C E E D I N G S
2      THE COURT:  All right, in re: Gateway Kensington,
3  LLC.
4      MS. AISNER:  Good morning, Your Honor.  Erica
5  Aisner, Kirby Aisner & Curley, Counsel for the Debtor.
6      THE COURT:  Morning.
7      MS. AISNER:  Morning.
8      MR. RATTET:  Robert Rattet, Davidoff Hutcher &
9  Citron for James Carnicelli.
10     THE COURT:  Morning.
11     MR. MASUMOTO:  Yes, good morning, Your Honor,
12 Brian -- sorry, go ahead.
13     MR. PASTORE:  My apologies.  Joseph Pastore,
14 Pastore & Dailey, also for Mr. Carnicelli.
15     THE COURT:  Okay.  Good morning.
16     MR. MASUMOTO:  Good morning, Your Honor.  Brian
17 Masumoto for the Office of the United States Trustee.
18     THE COURT:  Morning.
19     MS. DRISCOLL:  Good morning, Your Honor.  Theresa
20 Driscoll, Moritt Hock & Hamroff for Sterling National Bank.
21     THE COURT:  Morning.
22     MR. LEVITT:  Good morning, Your Honor.  This is
23 Steve Levitt and Trevor Gomberg Levitt LLP.  We also
24 represent Mr. Carnicelli.
25     THE COURT:  Okay.  All right, I think that's

1  everyone for this case, which again is Gateway Kensington,
2  LLC, the Chapter 11 case.  And on the calendar today is the
3  Debtor's motion for authority to sell Number 104, 15
4  Kensington Road, that apartment, under 363(b) and (f), under
5  the purchase agreement from April that's attached to the
6  motion.
7      I have the objection by the secured lender here to
8  the sale, which, as far as I can tell, objects to the
9  proposed amount of the payment of the sale proceeds to be
10 made to the secured creditor.  And I also have the US
11 Trustee's objection to that portion of the sale that seeks
12 an order paying the broker and some sort of consultant for
13 the sale.
14     So, first let me ask you, Ms. Aisner, have there
15 been any developments on the motion?
16     MS. AISNER:  There have been, Your Honor, and I
17 want to apologize to the Court and to the parties that have
18 objected.  Normally, I would have liked to have made some
19 progress on this, but I was out of the office last week in a
20 very remote area of the country that had neither cell
21 service nor Wi-Fi in most places, so --
22     THE COURT:  You were truly socially distancing.
23     MS. AISNER:  I was truly socially distant.  I had
24 zero bars.  So, if the Court would indulge me, I think I can
25 propose a couple of solutions so at least we can discuss

1  some of the aspects of the objections.
2      THE COURT:  Okay.
3      MS. AISNER:  And if I can just back -- I know
4  status isn't on today, but I just want to make sure the
5  Court is aware of a few items.  One is that we have prepared
6  an application to approve the Debtor's real estate broker,
7  which is Houlihan Lawrence.  We sent that application over
8  to the Office of the United States Trustee to review before
9  filing, and Mr. Masumoto, I won't speak for him, but he
10 raised a number of objections, mostly relating to the
11 payment of the broker's commission in connection with this
12 unit, which is actually also discussed in the motion.
13     THE COURT:  Right.
14     MS. AISNER:  He did not have an objection, to my
15 knowledge, to the retention of a broker on a go-forward
16 basis.  So, what I'd like to propose with respect to that is
17 that we simply, assuming the Court approves the sale of 104,
18 escrow the amount of the broker's commission, because I
19 believe that we need to prepare some supplemental briefing
20 on the issue.
21     And not to get too much into the weeds, but we
22 believe that the commission that's due in this property is
23 really part of a larger integrated agreement for all of the
24 units, and so we'd like the Court to consider approving the
25 commission on this unit.  But obviously, that's not before

1  the Court today, and so we'd like to adjourn that aspect of
2  the motion, so to speak.
3      And with respect to the proposed payment to the
4  consultant, we would like to withdraw that aspect of the
5  relief sought without prejudice. That payment is
6  compensation for that consultant. That's been the agreement
7  for all of the units since the Debtor closed its full-time
8  sales office, and this particular consultant worked full-
9  time for the Debtor previously. So, this is compensation we
10 may amend the schedules to provide for a priority claim for
11 her, at least to the extent of the cap. But again, I don't
12 think that's something that we need to litigate today,
13 so I'd like to adjourn those two aspects of the motion.
14     THE COURT: Okay.
15     MS. AISNER: Just so the Court is also aware, I
16 believe today an application will also be filed to approve
17 the retention of the Debtor's real estate counsel, Claude
18 Priolet. The US Trustee's office has already given our --
19 there are no objection to that. The counsel -- the counsel
20 is going to be paid $1,250 for the closing. It's normally
21 paid by the buyer, but in this particular transaction, it
22 was negotiated that the seller would pay it. So, obviously,
23 to the extent that the motion is granted today, that would
24 be subject to Your Honor's approval of that application,
25 which will be filed by the end of the day today.

1      THE COURT: Okay.
2      MS. AISNER: Okay. With respect to the motion in
3  general, I'm happy to address the merits of the motion.
4  With respect to Sterling's objection, the Debtor has $15
5  million in real estate assets, all of which are going to be
6  monetized in this Chapter 11 case.
7      Sterling Bank is owed $5.3, approximately. The
8  bank is well secured here. We're proposing to pay them the
9  amount of the release price that was contemplated under the
10 mortgage documents. We're also within the required loan-to-
11 value ratio provided in the mortgage documents. We have
12 been paying interest-only payments since the commencement of
13 the case and have every intention to continue to do so.
14     And the reason that the Debtor isn't able to
15 consent to give Sterling the amount that it's looking for,
16 which is basically nearly all the proceeds, is because the
17 Debtor needs to have cash on hand to pay its basic, bare-
18 bones operating expenses. There's no salaries coming out of
19 this. There's no discretionary money. This is for real
20 estate taxes, interest, interest payments to the bank,
21 insurance, and common charges.
22     What I wasn't able to provide to Ms. Driscoll
23 before today, or to file with the Court, was a longer-term
24 projection, which I received this morning from my client. I
25 asked them to tell me what the expenses would be over the

1  course of the next six months. And basically, at the end of
2  the next six months, there will be approximately $300,000 in
3  cash remaining, assuming that the Court approves the sale
4  and permits us to give the release price proposed in the
5  motion to Sterling. That also approves that the -- assumes
6  that the broker commission is also approved and paid;
7  otherwise, that would be excess as well.
8      The Debtor is getting ready to begin working on a
9  Chapter 11 plan. What I've been waiting on is a marketing
10 plan from the broker, so that we can understand what the
11 timeframe to sell these units is expected to be. Of course,
12 none of us has a crystal ball. But what we're trying to do
13 is make sure that the Debtor has sufficient cash on hand to
14 pay its expenses while it markets and sells these units.
15     There is a small amount of income that comes in
16 from rent. The projection that I've received assumes that
17 there are no more residential renewals, because if we renew
18 the leases that we have in place for some of the units, then
19 obviously, that puts the sale of the units on a far -- on a
20 longer timeframe.
21     So, as of the end of October, the only income that
22 the Debtor will be receiving is $17,700 a month, which is
23 the rent from the Naples commercial condominium. All of the
24 other residential rents would have termed out. That's not
25 to say that we are unwilling to continue to rent, but that's

1  something that we need to discuss with Sterling in
2  connection with the marketing plan, which I am told I will
3  have by the end of this week.
4      So, Your Honor, we're asking the Court to approve
5  the sale to allow us to pay the lease price that's provided
6  for under the mortgage documents, and then obviously, in
7  connection with continued authority to use cash collateral,
8  to use the remaining funds only to the extent absolutely
9  necessary to preserve the collateral while we market and
10 sell the rest of the units.
11     THE COURT: I didn't look at the cash collateral
12 in preparing for this. Is there a budget for that that
13 would include these items?
14     MS. AISNER: So, there is, Your Honor. There was
15 a bit of a mix-up with respect to the cash collateral. The
16 second interim order was granted at the last hearing, in
17 June, but wasn't entered by the Court. I believe it was
18 just entered on Friday. That contemplated a continued
19 hearing today. But given that we hadn't served the order,
20 chambers advised us that we could submit a bridge order, and
21 I believe we're going to take another interim period out to
22 the beginning of August.
23     But the budget that I will circulate to Ms.
24 Driscoll later today and then to the -- and submit to the
25 Court contemplates all of these items, and only these items.

Page 14

1  I mean, I have it in front of me. I could share my screen,
2  if that's permitted, or I can dictate them into the record.
3  But that is the bulk of the payments.
4      THE COURT: And they're consistent with the types
5  of payments that were contemplated by the two interim
6  orders?
7      MS. AISNER: Yes, Your Honor. In fact, I could
8  tell you that approximately $23,000 a month is for common
9  charges and annualized taxes and insurance, real estate
10 taxes and insurance. And then, the rest is basically an
11 interest payment to Sterling Bank, which all comes out to be
12 approximately $36,000 a month. There are some small
13 incidentals for utilities for vacant units, a small line
14 item for incidental repairs, although there really isn't
15 much. But that is the bulk of it, common charges, taxes,
16 insurance, and interest to Sterling.
17     THE COURT: Okay. Okay. All right. Has there
18 been any further interest? Anyone express any interest in
19 paying more than the $1.9 million that is the purchase price
20 under the sale agreement?
21     MS. AISNER: No, Your Honor. This unit was
22 actually initially marketed in 2015 for quite some time.
23 There wasn't really any -- there weren't any offers made.
24 It was then rented to help subsidize.
25     It was placed back on the market at $1.9 and -- by

Page 15

1  Houlihan Lawrence, and we -- this is a full asking-price
2  offer. We do believe that this is the highest and best
3  price for this unit, and it was procured at arm's length
4  through our third-party real estate broker.
5      THE COURT: So there would be -- if this were
6  sold, there would be six other properties in Bronxville,
7  plus the Naples property?
8      MS. AISNER: That's correct, Your Honor. And I do
9  want to correct one item in the motion. The motion said
10 that there's $10 million in equity in the properties -- I'm
11 sorry, $10 million in value. That should have read $10
12 million in equity. There's over $15 million in real estate.
13 Sterling is owed just over $5 million.
14     THE COURT: Are the other ones on the market at
15 this point?
16     MS. AISNER: So, they're not all on the market at
17 once. Some are rented. And when the bankruptcy filing took
18 place, I believe that administratively, Houlihan Lawrence
19 took everything off, and now they're going to be putting the
20 items back -- the units back on the market. But we're
21 trying to avoid a fire sale. The condo association would
22 very much like us to do this strategically and not just
23 place them all on the market at once. That's why I've been
24 waiting on a marketing plan from Houlihan Lawrence, so that
25 I can speak with more details about the timeframe and when

Page 16

1  they'll be marketed, and how, and of course, sharing that
2  with Ms. Driscoll and her client as well.
3      THE COURT: Was there anything unusual about this
4  apartment that made it much more valuable than the others?
5      MS. AISNER: Yes, actually. This one was slightly
6  higher priced initially because it had a more desirable
7  layout and location in the building, I'm told. But
8  apparently, it didn't warrant the elevated price that it was
9  initially marketed at, at $2.3. And at $1.9, the broker
10 felt that it was much more appropriately priced.
11     THE COURT: So, the other ones, do you have any
12 sense of their value? Like, are they $1.5, $1? I'm just
13 trying --
14     MS. AISNER: I do, Your Honor. They vary. Some
15 of them are penthouse units; some of them are, you know,
16 just regular units, if you will. They're all luxury. They
17 vary in price estimates, from $2.75 being the highest for
18 one of the penthouse units -- it's Penthouse 3 -- down to
19 $1.2 for Unit 312, and everything in between.
20     THE COURT: Okay.
21     MS. AISNER: The total estimated value of the
22 condominium units is $13.95, with the condo -- with the
23 commercial condo being $1.8.
24     THE COURT: And is that coming from Houlihan
25 Lawrence?

Page 17

1      MS. AISNER: The pricing for the Bronxville units
2  is. The pricing from the Florida condo, it was from a local
3  broker that was consulted down in Naples.
4      THE COURT: Okay. All right. Okay, so as far as
5  the two objections are concerned, Mr. Masumoto, I certainly
6  understand the basis for your objection, and I think the
7  Debtor did, too, with regard to the consultant, since that
8  request has been withdrawn.
9      As far as the Houlihan Lawrence portion of it, the
10 case law is generally in your favor. But there is some
11 variation in it, depending on whether the agreement with the
12 broker is executory or not. And given what Ms. Aisner has
13 recited, it seems to me it's probably better to deal with
14 that issue separately and set aside the broker's money at
15 this point, subject to further determination as to whether
16 the broker would be entitled to it, or instead, whether it
17 would go to (indiscernible) creditor.
18     MR. MASUMOTO: Good morning, Your Honor. Brian
19 Masumoto for the Office of the United States Trustee. Your
20 Honor, I have no objection to deferring the issue. I would
21 like to state for the record that during my conversations
22 with Counsel prior to this hearing, I don't believe I
23 indicated that I was okay with the going-forward retention
24 if the -- if the Debtor -- I mean, I'm sorry, if the broker
25 is seeking to be compensated for its prepetition claim.

Page 18

1 Whether or not it's treated as exhibitory and cured, if he's
2 a prepetition creditor, then technically, he would not be
3 disinterested.
4   So, even if -- sorry -- even if it were somehow
5 assumed, from my standpoint, unless there's some additional
6 information, he would be a prepetition creditor.
7   THE COURT: Well, perhaps. We have to see whether
8 the agreement has enough of a benefit on an aggregate basis
9 to warrant compensation for this unit at the 4 percent.
10   So, why don't we turn, then, to the sale motion
11 itself, which again, as I said, has been objected to by
12 Sterling National Bank. As I said, the objection didn't
13 really object to the amount of the purchase price, and it
14 does appear to me that that price was derived through a fair
15 sale-price process, conducted by a reputable third-party
16 broker, Houlihan Lawrence. But rather, the objection is
17 based on the amount of the sale proceeds that would be paid
18 immediately to the creditor on the closing.
19   From Ms. Aisner's remarks, my takeaway is that the
20 remaining sale price would not be paid immediately to the
21 secured creditor, but rather, would be held by the Debtor,
22 subject to working out the terms of a third interim and
23 perhaps final cash collateral order and determination of
24 what the broker is owed, which seems like a reasonable
25 solution here, given the representations Ms. Aisner has made

Page 19

1 that that money would be primarily for either maintaining
2 and preserving the property or paying debt service on the
3 rest of the loan.
4   MS. DRISCOLL: Judge, may I be heard, please?
5   THE COURT: Sure.
6   MS. DRISCOLL: Thank you, Your Honor. Theresa
7 Driscoll, for the record, on behalf of Sterling National
8 Bank. Your Honor, your description of and maybe recapturing
9 what Ms. Aisner said actually, you know, is slightly
10 different than when I read the motion.
11   THE COURT: Well, I can understand that.
12   MS. DRISCOLL: Yeah, okay. Yeah, so two things I
13 was principally concerned with. One, you know, having any
14 (indiscernible), you know, at 7 percent of the -- of the
15 total proceeds, and then the rest being used, you know, not
16 subject to my consent -- or the bank's consent, excuse me.
17 And secondarily, setting a precedent in the case, which I've
18 been really trying to work hard with Ms. Aisner, recognizing
19 that, you know, her travel schedule has a little bit
20 complicated things recently, but to get a release price that
21 we could agree upon, you know, before going forward for the
22 rest of the unit sales, and have that maybe embodied and
23 subject to Your Honor's approval.
24   So, we're not there yet. If Your Honor, you know,
25 approves the sale, which the bank does not object to the

Page 20

1 business judgment to the Debtor, nor does it object to the
2 sale price, and if we can get the minimum release price that
3 is set forth, which is, you know, a minimum price -- and you
4 know, the bank takes issue with the characterization that
5 it's the price to be paid for each of the units because it's
6 conditioned upon a couple of things, including the loan not
7 being in default, and it is in default currently -- as well
8 as the debt service coverage ratios. If we could get paid
9 the minimum price and then have the balance or some portion
10 escrowed, specifically escrowed, that we could then agree
11 upon, hopefully, the use of those monies subject to further
12 order of the Court, that would be my preference.
13   THE COURT: Okay. Well, it's clearly cash
14 collateral, so the Debtor can't use it without your consent
15 or an order. So, I don't think it needs to be in a separate
16 escrow account, but obviously, the Debtor can't use the
17 money. It will go into the DIP account and stay there
18 unless there's permission to use it, either from me or from
19 your client.
20   Okay. So, does anyone else have anything to say
21 on the motion?
22   All right. I will grant the motion, as modified.
23 The sale price, again, appears to me to be a reasonable
24 price, derived from an extensive marketing effort conducted
25 by a reputable broker, Houlihan Lawrence. The Debtor's

Page 21

1 business decision clearly makes sense. These properties
2 were constructed for ultimate sale, and in fact, arguably,
3 one could say this is ordinary course. But given the size
4 of the Debtor, I think the Debtor was wise in seeking Court
5 approval.
6   The two objections do not go to the bona fides of
7 the sale itself, but to the proposed use of the sale
8 proceeds. I'll approve the sale free and clear, provided
9 that the so-called release price be paid at or promptly
10 after the closing to the secured lender, Sterling National
11 Bank; that the putative commission to Houlihan Lawrence be
12 set aside in the DIP account pending further order of the
13 Court, with all rights reserved as to Houlihan's entitlement
14 to the broker's commission with regard to this property; and
15 the remaining sale proceeds clearly being found by me to be
16 Sterling National Bank's cash collateral, and therefore,
17 subject to 363 of the Bankruptcy Code, and either agreement
18 to be so ordered by me with regard to the use of that cash
19 or an order, hopefully not being necessary, but or an order
20 over Sterling's objection as to the use of that money.
21   Clearly, I'm not establishing any sort of legal
22 precedent here regarding release prices and the construction
23 of the parties' loan agreement regarding the release price
24 as a separate payment of the release price, as a separate
25 basis for a sale free and clear under 363(f)(5). I think it

| Page 22 | Page 24 |
|---|---|
| 1  would be, rather, the basis for the payment here is | 1  THE COURT: Okay. Good morning. |
| 2  363(f)(3) and being free and clear. | 2  MR. REICH: Good morning. |
| 3  There's no requirement that the total amount of | 3  MR. MAGALIFF: Howard Magaliff, Rich Michaelson |
| 4  the cash proceeds be paid at closing to Sterling National | 4  Magaliff for the Trustee, Judge. |
| 5  Bank; only that Sterling's rights to adequate protection, | 5  THE COURT: Morning. |
| 6  including with respect to cash collateral, are preserved, | 6  MR. RATTET: Robert Rattet, Davidoff Hutcher & |
| 7  and I believe that this order would do that. | 7  Citron for James Carnicelli. |
| 8  So, you can email the order approving the sale to | 8  THE COURT: Morning. |
| 9  chambers. Ms. Aisner, you should copy Ms. Driscoll and Mr. | 9  MR. PASTORE: Joseph Pastore from Pastore & Dailey |
| 10  Masumoto on it so they can make sure it's consistent with my | 10  for Mr. Carnicelli. |
| 11  ruling. | 11  THE COURT: Morning. |
| 12  MS. AISNER: I will, Your Honor. If I can just | 12  MR. LEVITT: Steve Levitt and Trevor Gomberg, Your |
| 13  ask for one clarification, did you say that you were | 13  Honor, also for Mr. Carnicelli, from Levitt LLP. Good |
| 14  granting the motion under (f)(3) or (f)(5)? I apologize. | 14  morning. |
| 15  THE COURT: (f)(3). | 15  THE COURT: Good morning. |
| 16  MS. AISNER: (f)(3), okay. | 16  MR. BENOWICH: Your Honor, Leonard Benowich for |
| 17  THE COURT: (f)(5) might be a basis, based on the | 17  John Fareri, Julie Zielenski, and Chris Sheskier. |
| 18  release price, but we're not getting into that -- | 18  THE COURT: I'm sorry, the last one? |
| 19  MS. AISNER: Okay. | 19  MR. BENOWICH: Sheskier. |
| 20  THE COURT: -- the interpretation of that | 20  THE COURT: Right, thank you. Okay, I think |
| 21  provision at this point. There's no precedential effect | 21  that's everyone who wanted to make an appearance. |
| 22  under (f)(5). | 22  So, this had originally been scheduled as the date |
| 23  MS. AISNER: Okay. | 23  for the hearing on Mr. Carnicelli's motion on behalf of, or |
| 24  THE COURT: Is this looking to close right away? | 24  derivatively on behalf of, I think, the Debtor, maybe also |
| 25  Do I need to waive the 14-day stay, or... | 25  on his behalf individually, for an order dismissing this |

| Page 23 | Page 25 |
|---|---|
| 1  MS. AISNER: You know what, Your Honor? I do | 1  Chapter 7 case under Section 707(a) of the Bankruptcy Code. |
| 2  believe that they want to close quickly. I don't know if | 2  I had entered an order on, I believe, June 18, |
| 3  they're going to need to close in the next 14 days. The | 3  granting Mr. Carnicelli's request for expedited document |
| 4  buyer is actually handicapped, so there was some urgency | 4  discovery and interrogatories, pending this hearing. I |
| 5  about making sure that they could get in quickly. So, if | 5  received an email either Friday or Thursday last week, |
| 6  Your Honor is willing to waive the 14-day, that would | 6  stating that there was a dispute as to Mr. Carnicelli's |
| 7  probably be helpful. | 7  desire to take depositions of three individuals represented |
| 8  THE COURT: All right. I think given the outcome | 8  by Mr. Benowich and requesting that today's hearing be |
| 9  of this hearing, there's no one really opposing that, so I | 9  treated only as a discovery conference. I've since received |
| 10  will -- I will grant that relief, too -- | 10  Mr. Benowich's letter in response, as well as a response by |
| 11  MS. AISNER: Thank you, Your Honor. | 11  Mr. Reich on behalf of the Debtor. So, I think that's all |
| 12  THE COURT: -- and waive the 14-day stay under | 12  of the pleadings that were filed recently in this case. |
| 13  Rule 6004 -- and 6006, I guess, because this is a 365 as | 13  Of course, I did have the dismissal motion and the |
| 14  well. | 14  objections to it, which were filed not only by the Debtor, |
| 15  MS. AISNER: Yes, Your Honor. Thank you. | 15  but also by a creditor. And there was also a response by |
| 16  THE COURT: Okay. All right, so I think that | 16  the Chapter 7 Trustee. |
| 17  concludes Gateway Kensington, and then we have in re: | 17  So, I want to cut through the discovery issue. If |
| 18  Gateway Development Group as the last matter on the calendar | 18  there was a doubt, and it sounds like there might have been |
| 19  for today. | 19  a doubt, as to the capacity in which the prospective |
| 20  MR. REICH: Good morning, Your Honor, Jeffrey | 20  deponents were going to be deposed, I think it's now clear |
| 21  Reich -- | 21  that they are to be deposed as corporate representatives, or |
| 22  MR. MAGALIFF: Good morning -- | 22  representatives of the corporate Debtor. Is that correct? |
| 23  MR. REICH: Good morning. Jeffery Reich from the | 23  MR. PASTORE: This is Joseph Pastore, Your Honor. |
| 24  law firm of Reich Reich & Reich, P.C. We are the attorneys | 24  Yes, that's our understanding. |
| 25  for the Gateway Development Group Inc. | 25  THE COURT: All right, so -- |

7 (Pages 22 - 25)

Page 26

1  MR. PASTORE: We apologize to the extent there was
2  any confusion.
3  THE COURT: All right, that's fine. So, in any
4  event, I gather, then, that there's no problem with those
5  depositions going forward. Although, if it's under
6  30(b)(6), I'm not sure why there would need to be three as
7  opposed to one.
8  MR. LEVITT: No, it's just (indiscernible). Your
9  Honor, if I'm -- this is Steve Levitt. It's not -- they're
10 not 30(b)(6) depositions. They would be 30(a)(1)
11 depositions.
12 THE COURT: 30(a)(1), okay.
13 MR. LEVITT: Officers, managers, or directors
14 of --
15 THE COURT: All right, that's fine. So, is there
16 any issue with those going forward, and the parties will be
17 scheduling them routinely before the -- before the adjourned
18 hearing?
19 MR. REICH: With respect to the Debtor, Your
20 Honor, I don't have any issue other than a couple of things.
21 Mr. Sheskier is not an employee or an officer of the Debtor.
22 He did put in an affidavit, or the Debtor did put in his
23 affidavit in support of its opposition, and it can produce
24 Mr. Sheskier to the extent, you know, of his testimony with
25 respect to the motion to dismiss and on the information that

Page 27

1  he provided in the affidavit. So, I -- Ms. Zielinski and
2  Mr. Fareri are both officers of the Debtor, so that's --
3  those are a little different.
4  Again, those weren't noticed in that capacity, but
5  I'm happy to produce -- as long as we -- as long as there's
6  an understanding of the scope of the deposition. That's the
7  big -- that is a silent part, a big silent part of their
8  notice.
9  THE COURT: Well, and that is something that
10 should be covered, so the parties should discuss that
11 promptly.
12 MR. REICH: Okay.
13 MR. LEVITT: Your Honor, this is Mr. Levitt again,
14 if I may. Mr. Fareri testified that Mr. Sheskier was the
15 CFO for all of his companies, and --
16 THE COURT: Well, let me just ask, is there -- is
17 there a -- I guess, Mr. Benowich, are you or Mr. Reich
18 requiring that there be a subpoena of him?
19 MR. BENOWICH: Mr. Sheskier testified pursuant to
20 a subpoena issued by the Trustee. If he's sought in his
21 individual capacity, as he must be, they'll need a subpoena.
22 THE COURT: Okay. All right, so it's probably
23 better to subpoena him, rather than just rely on the prior
24 testimony, because we might be here again on that issue.
25 MR. BENOWICH: Understood.

Page 28

1  THE COURT: And the parties, again, should discuss
2  the scope of the deposition. And I'm saying this in part
3  because -- and I might as well just get this out on the
4  table -- I have a considerable degree of skepticism with
5  respect to this motion to dismiss, given that we're in a
6  Chapter 7 case with a trustee and many creditors.
7  Now, if the issue is the authority of the Debtor
8  to file in the first place, the corporate authority, I would
9  understand that, certainly. But the "bad faith" case law
10 under 707(a) for a corporate debtor is very limited in its
11 applicability. And that's particularly so with respect to
12 someone who's appearing on a derivative basis, or whose
13 claim is on a derivative basis.
14 So, you're certainly free to pursue the motion,
15 but I'm giving you the heads-up that, at least based on the
16 papers, it doesn't appear like a winner to me.
17 MR. PASTORE: Judge, this is Joseph Pastore.
18 Appreciate your comments very much and appreciate you
19 resolving the discovery dispute. Obviously, we're going to
20 file a reply prior to the hearing. We'd like the
21 depositions prior to that. With respect to the creditors,
22 we'll get into the why. It's just our view that most of
23 them are not real.
24 THE COURT: Well, the Trustee can figure that out,
25 right? That's why you have trustees. You're not listening,

Page 29

1  Mr. Pastore. You're going to lose, all right? So, you
2  could spend the money; you have about a 10 percent chance of
3  winning, unless you can show that this petition was not
4  authorized. I couldn't be clearer. I'm trying to be
5  diplomatic, but that's it. All right?
6  MR. PASTORE: I apologize, Your Honor. I am
7  simply advocating my client's position. I understand that
8  I'm likely to lose.
9  THE COURT: All right. Well, your client should
10 understand that before it spends money on three depositions
11 and a reply and a trial, it may want to think about it,
12 particularly since he's ostensibly appearing derivatively.
13 MR. PASTORE: Okay.
14 THE COURT: Okay.
15 MR. MAGALIFF: Your Honor, can I give you a quick
16 update from here?
17 THE COURT: Yes.
18 MR. MAGALIFF: Since I filed the statement, we've
19 closed on the sale of the vehicle assets, and we sent out
20 additional account receivable demand letters.
21 There are two principal concerns that I had and
22 have regarding the timing of the motion. One, obviously,
23 you've pretty much addressed. The other is that there -- we
24 have two main assets in the Chapter 7 case. We have the
25 arbitration award, obviously, and we have the litigation.

8 (Pages 26 - 29)

| Page 30 | Page 32 |
|---|---|
| 1  And right now, the status of the litigation, as you probably<br>2  know, is that we've removed it to the District Court in<br>3  Connecticut, made a motion to transfer venue, and they've<br>4  made a motion to remand and oppose the venue transfer.<br>5  I had thought that one of the potential outcomes<br>6  that might advance the ball for everybody is a denial of the<br>7  motion without prejudice, and the reason I was suggesting<br>8  that is because our briefing schedule in Connecticut says<br>9  that Judge Chatigny in the District Court is not going to<br>10  address those motions until 14 days after you rule on the<br>11  motion to dismiss, which is when the next round of briefing<br>12  is. So, we're kind of hung up while all this is going on.<br>13  So, in light of your comments and whatnot, I was<br>14  going to suggest that perhaps you could deny the motion<br>15  without prejudice, and if they really want to do the<br>16  depositions and then feel they have a legitimate basis to<br>17  bring the motion, they can. And in the meantime, we can go<br>18  forward in Connecticut and continue with the administration<br>19  of the case.<br>20  THE COURT: Okay. Do you want to proceed with the<br>21  Connecticut litigation?<br>22  MR. MAGALIFF: Well, we want to bring the<br>23  Connecticut litigation into the Bankruptcy Court and<br>24  proceed. I mean, we're in the process -- I'm doing two<br>25  things now, and one of them they actually raised in their | 1  THE COURT: Okay. So, remind me, the Connecticut<br>2  litigation is against whom and in what capacity?<br>3  MR. MAGALIFF: Mr. Carnicelli asserted<br>4  predominantly derivative claims against Mr. Fareri<br>5  individually, against Mr. Sheskier, and against Julie<br>6  Fareri, the three individuals that they want to depose.<br>7  They were breach of fiduciary claims, loss of corporate<br>8  opportunity claims, things like that. He also sought the<br>9  dissolution of Gateway Development, but that will occur in<br>10  the Chapter 7 case. And then, he had claims that at least<br>11  one of which was a purely, at least on its face, individual<br>12  claim, which was a cause of action against Mr. Fareri for<br>13  breach of their shareholder agreement.<br>14  But most of the claims were derivative claims<br>15  asserted on behalf of the Debtor (indiscernible) property of<br>16  the estate, and we discussed that somewhat extensively at<br>17  the last hearing, given the case law on derivative standing<br>18  and whatnot. So, that's the nature of the claims. And I<br>19  don't know enough about them yet to tell you if they're<br>20  good, bad, or somewhere in between. But they're valid<br>21  claims, they're meritorious claims, and they need to be<br>22  investigated.<br>23  THE COURT: Okay. Well, I now understand better,<br>24  Mr. Reich, your concern about the scope of these<br>25  depositions. |
| Page 31 | Page 33 |
| 1  papers, which is that I took Mr. Sheskier's deposition but<br>2  wouldn't allow them to ask questions. The reason I did<br>3  that, Judge, is because we're proceeding on two different<br>4  tracks here.<br>5  I was examining Mr. Sheskier as the trustee to<br>6  learn about the assets, the financial affairs, the schedules<br>7  and all that, and I wasn't prepared to open it up for<br>8  general discovery that they could use in the motion to<br>9  dismiss, particularly since they were seeking to take their<br>10  own discovery. So, my special counsel, Pullman & Comley, is<br>11  prepared to delve thoroughly into the Connecticut litigation<br>12  because there are significant claims there.<br>13  And I might add, although we haven't asserted any<br>14  yet, we are also investigating claims that the estate may<br>15  have against Mr. Carnicelli. So that, obviously, is not<br>16  impacted by the current state of the motion to dismiss, but<br>17  our ability to do anything with respect to the claims<br>18  asserted in the Connecticut case is, particularly given your<br>19  comments at our hearing when we had the objection to the<br>20  retention, when you suggest that let's, you know, not really<br>21  spend any time or money or effort with regards to those<br>22  claims until we sorted out the motion to dismiss. But if<br>23  that's going to get kicked, then we're kind of -- we have<br>24  our hands tied with respect to doing anything on those<br>25  claims. That was all. | 1  MR. REICH: And, Your Honor, I tried to point it<br>2  out in my letter to Your Honor Friday night, albeit it was<br>3  Friday night, it was last minute, and I was rushing all over<br>4  the place for the weekend myself. But I can say, and all<br>5  parties can be heard on this -- certainly Mr. Magaliff can<br>6  say -- the six-and-a-half hours of Mr. Sheskier's testimony<br>7  was thorough. And I'm not just tooting Mr. Magaliff's horn.<br>8  He knows what he's doing.<br>9  And he -- and we allow -- without any objection,<br>10  Mr. Magaliff had a six-and-a-half-hour conversation on the<br>11  record with Mr. Sheskier explaining all that he did to aid<br>12  Mr. Fareri and the Debtor to prepare the bankruptcy<br>13  schedules and petition. He testified with respect to each<br>14  and every at least -- actually, not only the affiliated<br>15  entities, but with respect to each and every creditor that<br>16  was listed in Schedule F of the petition, and literally went<br>17  down one at a time to say, this is what was done to figure<br>18  out what (indiscernible). He testified what he was told,<br>19  which is accurate. The Debtor needs to list every possible<br>20  claim of anybody against it, anywhere in the world.<br>21  And he and his -- he has a staff, apparently, that<br>22  works for Fareri Associates and other related entities.<br>23  They're accountants, and they literally did a -- it sounded<br>24  to me like an audit of the Debtor's books and records and<br>25  all of its possible account receivables and possible account |

| | |
|---|---|
| Page 34 | Page 36 |

### Page 34

1  payables and aided the Debtor in preparing the petition.
2  So, I question what scope there could be, beyond that
3  testimony. With respect to -- and that transcript has been
4  ordered on an expedited basis by Mr. Carnicelli, so they
5  have it, as do we.
6  　　Too, with respect to Mr. Fareri, he was produced
7  at the 341(a) meeting. Mr. Magaliff again had a thorough
8  examination, albeit shorter, and I believe properly opened
9  the floor to Mr. Carnicelli's attorneys. They will
10 represent -- there was three of them on the phone, but Mr.
11 Levitt, I believe, asked the questions. And they asked Mr.
12 Fareri a lot of questions that covered most, if not all,
13 questions that could be asked regarding the petition, some
14 of which he didn't know, admittedly. He testified to what
15 he knew; he testified -- was unable to testify to other
16 things.
17 　　And subsequent to that 341(a) meeting, Mr.
18 Magaliff and I spoke, and I think Mr. Magaliff was aware in
19 advance as well that Mr. Sheskier would be able to testify
20 and explain exactly how the schedules and petition were
21 derived and what was done. And Mr. Sheskier agreed to
22 voluntarily produce himself on behalf of the Debtor. Again,
23 to my knowledge, he does not work there; he never worked
24 there and is not an officer of the company.
25 　　Mr. Magaliff issued a subpoena. I accepted the

### Page 35

1  subpoena on Mr. Sheskier's behalf, and he appeared. So,
2  there've been nine hours of testimony in this case with
3  respect to the background of this matter and the petitions
4  and schedules, and all that was done in between.
5  　　THE COURT: Okay. Well, look, Mr. Pastore, Mr.
6  Levitt, and Mr. Rattet, I guess you're perfectly free to
7  delay things if you want to. It doesn't seem to me to be a
8  very productive road, certainly not a productive road for
9  someone who wants to pursue a claim on behalf of all the
10 creditors.
11 　　But you know what? Be my guest. If you're not
12 going to take advice, you're not going to take advice. All
13 right?
14 　　MR. PASTORE: Well, Judge, we're not -- we
15 understand what you're saying. We'll discuss it.
16 　　THE COURT: I thought it was understood last time.
17 So, get a date from Ms. Li for the joint hearing on the
18 motion to dismiss.
19 　　CLERK: Your Honor, (indiscernible).
20 　　THE COURT: He's late.
21 　　CLERK: Oh, okay.
22 　　MR. RATTET: Your Honor, we have an
23 (indiscernible) date suggested of August 6.
24 　　MR. REICH: Mr. Rattet, Bob, I won't -- I'm sorry,
25 I'm on my 20th anniversary. I'm going away with my wife for

### Page 36

1  five days, and that wouldn't go over well, so I would
2  appreciate another date.
3  　　THE COURT: Okay.
4  　　MR. REICH: So, I'm going to be away August 4
5  through 9.
6  　　MR. RATTET: The motion before the -- I have, Your
7  Honor -- sorry. Mr. Reich, I have no problem accommodating
8  you, all right? I just would prefer -- I didn't know if
9  Judge Drain was going to be around more than -- longer in
10 the month of August. But, Judge Drain, do you have an
11 alternative date to that?
12 　　THE COURT: Talk to Ms. Li. Yeah, I'm here -- I'm
13 here all of August.
14 　　MR. RATTET: Okay, because we have -- we had
15 joined both the Gateway Development and the Gateway
16 Kensington hearings for the same date. Okay? So, I will
17 speak to Ms. Li and see if we can find a common date. In
18 fact, the 6th, I was going to be calling in from San
19 Francisco, so I --
20 　　THE COURT: Well, the 6th is the motion for a
21 trustee in Kensington? Is that --
22 　　MR. RATTET: Yes.
23 　　THE COURT: Okay.
24 　　MR. RATTET: I was trying to join it both
25 together. We would take judicial economy and have both

### Page 37

1  hearing on the same day.
2  　　THE COURT: I think they're very different issues,
3  so I don't -- I understand where your thinking was, Mr.
4  Rattet, but they don't need to be together.
5  　　MR. RATTET: Mr. Reich's availability is --
6  　　THE COURT: Well, he's not going to be involved in
7  Kensington, I'm assuming.
8  　　MR. REICH: No, sir.
9  　　MR. RATTET: We can leave that on the 6th, then.
10 　　THE COURT: If she gave you that date, yes, that's
11 fine.
12 　　MR. RATTET: She did. We have served for that
13 date already.
14 　　THE COURT: Okay. All right. Very well.
15 　　MR. RATTET: Thank you, Your Honor.
16
17 　　(Whereupon these proceedings were concluded at
18 11:25 AM)

Page 38

```
 1                I N D E X
 2
 3              RULINGS
 4                         Page    Line
 5  Modified Motion Granted   20     22
 6
 7
 ...
25
```

Page 39

1  C E R T I F I C A T I O N
2
3      I, Sonya Ledanski Hyde, certified that the foregoing
4  transcript is a true and accurate record of the proceedings.
5
6  *[signature: Sonya V. Ledanski Hyde]*
7
8  Sonya Ledanski Hyde
9
...
20  Veritext Legal Solutions
21  330 Old Country Road
22  Suite 300
23  Mineola, NY 11501
24
25  Date: September 27, 2022